UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

------------------------------------------------------------

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )   Case No. CR 18-157
                                   )   Green Bay, Wisconsin
        vs.                        )
                                   )   August 14, 2019
THOMAS J. OWENS,                   )   1:35 p.m.
                                   )
                    Defendant.     )

------------------------------------------------------------

**TRANSCRIPT OF EVIDENTIARY HEARING**
BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

 For the Plaintiff
 UNITED STATES OF AMERICA:     United States Dept of Justice
                               (ED-WI)
                               By: DANIEL R. HUMBLE
                               Office of the US Attorney - 205
                               Doty St - Ste 301
                               Green Bay, WI 54301
                               Ph: 920-884-1066
                               Fax: 920-884-2997
                               Daniel.Humble@usdoj.gov
 For the Defendant
 THOMAS J. OWENS:              Pruhs & Donovan SC
 (Present)                     By: CHRISTOPHER D. DONOVAN
                               757 N Broadway - Ste 401
                               Milwaukee, WI 53202
                               Ph: 414-221-1950
                               Fax: 414-221-1959
                               donovanc34@hotmail.com


 U.S. Official Transcriber:    JOHN T. SCHINDHELM, RMR, CRR,
 Transcript Orders:            WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

1

TRANSCRIPT OF PROCEEDINGS

Transcribed From Audio Recording

*      *      *

THE CLERK:  The Court calls Case 18-CR-157, United States of America vs. Thomas J. Owens for an evidentiary hearing.  May I have the appearances, please?

MR. HUMBLE:  Dan Humble for the Government, along with Misha Linsmayer (phonetic) from our office, Your Honor.

THE COURT:  Good afternoon.

MR. DONOVAN:  Attorney Chris Donovan appearing on behalf of Mr. Owens who is here in person on my right.  And then, also to my immediate right is our expert, Peyton Engel.

THE COURT:  Okay.  Good afternoon.

So we have put this on for a hearing on the motion to disclose investigative BitTorrent software and related documents.  And the government has opposed the motion on the basis of the law enforcement privilege?

MR. HUMBLE:  Yes, Your Honor.

THE COURT:  Or investigation privilege?

And so the -- I guess, what do you -- Mr. Donovan, it's your motion, how would you plan on proceeding?

MR. DONOVAN:  Your Honor, what I envision is I would call my expert.  I think that we have at least the initial burden under Rule 16 to show that the requested material is material to preparing our defense.

1       THE COURT:  Uh-huh.

2       MR. DONOVAN:  And then I think the burden on the law

3   enforcement privilege would fall to the government, so they can,

4   you know, carry that burden when they call their witness.

01:46   5       THE COURT:  That sounds good.  Go ahead.  You may call

6   your witness.

7       MR. DONOVAN:  Do you want him up on the witness stand?

8       THE COURT:  Oh, yeah.

9       MR. DONOVAN:  Okay.

01:46   10      THE CLERK:  Please raise your right hand.

11      Do you solemnly swear the testimony you are about to

12  give today is the truth, the whole truth and nothing but the

13  truth so help you God?

14      THE WITNESS:  I do.

01:46   15      THE CLERK:  Please state and spell your first and last

16  name for the record.

17      THE WITNESS:  My name is Peyton Engel, that's

18  P-e-y-t-o-n, E-n-g-e-l.

19      THE COURT:  Thank you, Mr. Engel.

01:48   20      Go ahead, Mr. Donovan, you may proceed.

21      MR. DONOVAN:  Thank you, Your Honor.

22      PEYTON ENGEL, DEFENSE WITNESS, DULY SWORN

23                  DIRECT EXAMINATION

24  BY MR. DONOVAN:

01:48   25  Q.  Good afternoon, Mr. Engel.  I just want to run through a few

3

1    background questions with you.  Can you state your education

2    background?

3    A.  I have a bachelor's degree in Russian from Grinnell College,

4    a master's in Russian literature from the University of

01:53    5    Wisconsin-Madison, and a JD from the University of

6    Wisconsin-Madison.

7    Q.  And can you do a brief overview of your work history?

8    A.  Yes.  In about 1997, I went into the field of IT networking,

9    the bottom having fallen out of the Russian literature market.

01:53    10    And I specialized in computer security for about 16 years.  And

11    that included doing forensic investigations and incident

12    response.

13    Q.  And where do you work now?

14    A.  I currently work for a law firm in Madison, Wisconsin that's

01:54    15    called Hurley Burish.

16    Q.  And can you just give a brief on overview, not necessarily

17    maybe listing everything, but some examples of your

18    certifications and continuing education in the computer field.

19    A.  I routinely provide training.  So I speak at conferences and

01:58    20    at trainings, for example, for the state public defender, mostly

21    regarding how to work with computer experts, how litigators

22    should work with computer experts.

23    I maintain the CISSP -- that's Certified

24    Information -- CISSP, Certified Information Systems Security

01:58    25    Professional certification -- which is sort of a broad or a

4

1    generalist security certification but it's, for better or worse,

2    one of the standard ones that people obtain in the field.  It

3    includes some requirements for forensics and incident response

4    knowledge as well.

01:59    5    Q.  Thank you.  You mentioned that you train other professionals

6    in this area, correct?

7    A.  Yes.

8    Q.  And so you've spoken at different conferences?

9    A.  Yes.

01:59    10    Q.  And do you also have some published works?

11    A.  Yes.

12    Q.  Can you give an example of a few of those?

13    A.  The most recent one was an article on cell phone forensics

14    and that appeared in The Champion, which is the National

01:59    15    Association of Criminal Defense Lawyers publication.

16    Q.  And you've testified in court before?

17    A.  Yes.

18    Q.  And related to, again, computer issues?

19    A.  Yes.  I've appeared as an expert witness.  This is my first

02:06    20    venture into federal court, but I've appeared as an expert at

21    trial and at evidentiary hearings in a number of state court

22    proceedings.

23    Q.  Can you give a rough estimate?

24    A.  My affidavit actually lists some specific ones.  I've

02:06    25    probably appeared in 10 or so, 10 or 12.  And then I've been an

1    expert in dozens more, but those haven't gone to trial.

2    Q.  Okay, thank you.  Okay.  Have you also done some prior work

3    for law enforcement before?

4    A.  Once in a while.  The most notable incident was -- well,

02:07  5    never been deputized or anything like that, but in the course of

6    my work I've assisted -- the FBI was the most notable, in an

7    industrial espionage case down in Madison.

8    Q.  So is it fair to say you've worked on both the defense side

9    and law enforcement?

02:08  10   A.  Yes, though heavily more on the defense side.

11   Q.  Correct.  Okay.  Okay.  Can you kind of explain what a

12   peer-to-peer network is and how it operates?

13   A.  Sure.  A peer-to-peer -- well, the standard architecture on

14   the internet is what's called a client server architecture.  You

02:09  15   have a centralized resource, say a website or something like

16   that, that many people want to access.  And so they'll use a

17   client piece of software like a web browser to see the web

18   server.  And that shares this one central resource among many

19   other users.

02:09  20         A peer-to-peer architecture is just a different

21   arrangement.  Instead of having one central resource, resources

22   are distributed across the network and users share and consume

23   on an as-needed basis.

24   Q.  And to access a peer-to-peer network you have to download

02:09  25   like a special type of software?

1    A.   Yes.   There's usually a peer-to-peer client software

2    involved.

3    Q.   Can you explain what open source software would be versus

4    not open source?

02:10    5    A.   Sure.   Software is developed by programmers.   And

6    programmers write in a computer language.   So, for example, C or

7    Java.   And that language is compiled -- the C or Java code

8    itself is not what the computer runs.   It's compiled and

9    generated into an executable program for the computer.   But that

02:11    10    code that the programmers write is called the source code.

11                Closed source software means it's not publicly

12    accessible.   Open source software means that the source code is

13    available for others to review or potentially update and modify.

14    Q.   So would most of these peer-to-peer programs be open source

02:13    15    software?

16    A.   There's a variety.   There are -- so, for example, at issue

17    in this case is BitTorrent.   There are both open and closed

18    source BitTorrent clients.

19    Q.   Okay.   Now, is it your experience and knowledge that all

02:14    20    software is subject to having bugs or errors or malfunctions in

21    it?

22    A.   Yes.   This is a universal truth.   I mean, not all software

23    has tons of bugs.   Some is sounder than others.   But sort of the

24    gold standard for software bug-trimming would be avionics

02:16    25    software.   And we've just recently seen the 737 Max disasters.

7

1   So it's a certainly heavily reviewed, heavily audited code that

2   didn't function as expected.

3   Q.  So even commercial products like Microsoft Word or Excel or

4   other, you know, highly common programs have bugs and errors,

02:16   5   correct?

6   A.  Yes.  And these are systems that are wildly deployed, you

7   know, used by many, and there's a robust system for reporting

8   issues and, you know, having them escalated and filtered through

9   technical support.  But I still get updates from Microsoft

02:20   10   probably twice a month.

11   Q.  Can you explain a little bit more about like how they're

12   addressed?  So, for example, is there things called "patches"

13   that fix errors?

14   A.  Right.  A "patch" is a term for usually a small update to a

02:20   15   piece of software.  So there are patches.  And then larger

16   things might be called "service packs."  These are basically

17   usually small executable pieces of code that are delivered and

18   they update some aspect of a piece of software that's been

19   deployed out in the field.

02:21   20   Q.  Now, do most programs also go through what's called "beta

21   testing"?

22   A.  Yes.  Generally there's a beta phase before it's sent into

23   full production.

24   Q.  Could you explain what a beta test would be?

02:21   25   A.  Sure.  So a beta testing happens when people think the

8

1  software is pretty much done and more or less ready to deploy.

2  They'll deploy it in a way that generally more sophisticated

3  users who would be good at spotting issues and good at reporting

4  the issues, have a chance to tinker with the software and to use

02:24  5  it and get the hang of it before it gets a general release.

6  Q.  Is it kind of fair to say they kind of put it through its

7  paces before it becomes generally used?

8  A.  That's the idea of beta testing.

9  Q.  And just to be clear, are most beta testers outside the

02:25  10  entity or the company that made the software?

11  A.  That depends on the kind of software and who the eventual

12  user base is.  Probably in the world at large, yes, but for any

13  given project it might be different.

14  Q.  Now, can you describe briefly what the interface would look

02:25  15  like on a peer-to-peer program?

16  A.  Well, it's usually a graphical user interface these days.

17  There's a way of searching for -- let's restrict ourselves to

18  peer-to-peer file sharing programs.  There are other things out

19  there, but there would be an interface for searching for the

02:26  20  type of file you want to find.

21       So, for example, if I want to download the latest Star

22  Wars movie or something like that, there would be a place to

23  type in what I'm searching for and a place to see results and

24  select which ones I wanted to obtain.

02:26  25  Q.  So there would be like a search bar that you could type in

1    like a text search, for example?

2    A.   Yeah.   I mean, something -- something like that is present

3    somewhere along the way.   Different clients will look different,

4    but, yes, that functionality is there in one form or another.

02:27   5    Q.   Can users also search by hash values if they would know the

6    hash value of the particular file that they want?

7    A.   It would be strange for a user to even understand what a

8    hash value is.   I have no -- I mean, there's no reason the

9    software couldn't support that, but for someone to sit and enter

02:27  10    a 48-digit hexadecimal numbers -- I wouldn't think most users

11    would do that.

12    Q.   And maybe just to make sure everyone's on the same page, can

13    you briefly explain what a hash value is?

14    A.   Right.   So a hash value, sometimes people call it the

02:28  15    "digital fingerprint" of a file.   So suppose you have two files

16    and you want to know if they're the same.   Rather than go and

17    bit-by-bit compare them, you can pass them each through a

18    certain kind of mathematical function, called a "hash function,"

19    and you obtain a number.   And if those two numbers are the same,

02:28  20    then the chances are astronomically small that the two files are

21    different.   And so a hash value is sort of a shorthand for

22    identifying a file or a piece of a file.

23    Q.   Now, you've reviewed the pleadings in this case, correct?

24    A.   Yes.   At least the initial ones.

02:29  25    Q.   Including the government's response brief --

1    A.  Yes.

2    Q.  -- to our motion to compel?

3         Now, they raise this concern about if the program's

4    turned over that, you know, hash tags could be manipulated to

02:30  5    change and then they'd be harder to detect.  Right?  Do you

6    remember -- do you recall that?

7    A.  I do recall that.

8    Q.  Okay.  Now, why in your opinion would that be a red-herring

9    argument?

02:30  10   A.  For a couple of reasons.  First, I presume, but do not know,

11   that the database of known hash values is separate from the

12   program itself.  So one could look at the program without

13   necessarily seeing the full list of things that it looks for.

14        Second, the government discloses hash values every

02:31  15   time it applies for a search warrant.  You see not only the hash

16   value of the file that they say they've obtained, but also the

17   file name that is associated with it.  So it's not that any

18   individual hash value is that big a secret.

19        Third, it's possible for anyone on the internet to go

02:31  20   ahead and change a single bit in a file today without the

21   software having been disclosed.  And that would change the hash

22   value and it would no longer trigger the automated alerts that

23   the Torrential Downpour software generates.

24        That's something that could happen today for free and

02:33  25   without any -- you know, without any need for knowledge of the

1    code base.

2            But fourth, that would actually reduce the ability to

3    share or at least the ease with which people are sharing

4    contraband materials on the internet because of all the hash

02:33    5    value changes -- values change.  Then the Torrent clients won't

6    know how to find the software for the images or movies or

7    whatever it is they're downloading anymore because the whole

8    thing is premised on a shared, you know, set of hash values.

9            So, yes, that could happen.  But it doesn't seem to me

02:34    10    to be either a realistic possibility or one that would -- I

11    mean, it would actually probably cut down on the sharing of

12    child pornography on the internet.

13    Q.   Now, you talked earlier about source code versus the program

14    itself, right?

02:34    15    A.   Yes.

16    Q.   Can you explain what concerns there might be about turning

17    over source code?

18    A.   So the gold standard for understanding how a piece of

19    software works is to review the source code.  You get to see

02:34    20    pretty much everything it's capable of.  And you can then see

21    all of the inputs that it takes and all of the ways in which it

22    gives output and all of the logic that it operates on.  So the

23    concern there would be that by knowing that, one would know

24    something that couldn't otherwise be known.

02:36    25            So, for example, from time to time, and I believe in

1    this case, the government raises the concern that this kind of

2    disclosure would impede future or ongoing investigations.  So I

3    can think of a couple ways that that might happen.

4              One is, that we know from reading the warrants here

02:37    5    and in other cases, that RoundUp pretends to be sharing files in

6    order not to get kicked off the network or throttled from being

7    able to download files.

8              If it were the case that RoundUp always shared the

9    same list of files, that might be a way of recognizing RoundUp

02:39   10    and people who wanted to avoid being tagged by it would simply

11    hang up the phone whenever something sharing those files

12    connected.

13              Another thing might be that -- and this is

14    hypothetical.  I don't know this because I haven't had access to

02:40   15    the source code.  But another thing might be that if the system

16    is designed so that -- to prevent law enforcement in one

17    jurisdiction from accidentally investigating other users of

18    RoundUp in another jurisdiction, maybe there's something about

19    the way that it establishes its connection or operates -- or

02:41   20    interacts with the systems it's investigating that could be

21    recognized.  That would be another sort of handshake signature

22    that you could figure out this is RoundUp connecting to me and

23    then hang up the phone again.

24              That would be -- those would be two ways that I can

02:41   25    think of that would be potentially problematic.

1   Q.  Now, those concerns wouldn't be raised if it was just

2   getting access to the program and not the source code, correct?

3   A.  Well, it would be less of a concern.  It would sort of

4   depend on how the program operates and what we'd be able to

02:43   5   observe about it.

6   Q.  Fair enough.  I understand, again, you obviously don't have

7   access to the program so you can't say for sure.

8        Okay.  And I just want to clarify one thing.  When you

9   say RoundUp, you're using that interchangeably with Torrential

02:43   10   Downpour?

11   A.  Yes.  I am sorry.  That's a habit that I have.  The

12   investigative software, which is RoundUp-like, which is used on

13   BitTorrent, is called "Torrential Downpour" from what I've read.

14   Q.  Okay.  So going back to peer-to-peer network I guess

02:44   15   architecture.  So it's a decentralized network, correct?

16   A.  Yes.

17   Q.  And this would be to allow sharing more efficiently and

18   faster than if it was just in a centralized network?

19   A.  Right.  So the problem that the designers were attempting to

02:45   20   solve was, how do we exchange large files that aren't hosted at

21   some giant file repository like a Google Docs or something like

22   that?  How do we just trade large files on the internet?

23        And the issue is that when we purchase a connection to

24   the internet from our internet service provider, whether it's

02:46   25   AT&T or Comcast or whatever it is, the connection we get is

1    generally what's called asymmetrical.  Meaning that we can

2    download things much faster than we can upload them.  Because

3    the people who provision those circuits realize correctly that

4    for most people's purposes that's the right way to do it.  Most

02:46  5    people are much more interested in downloading things than they

6    are in uploading things.

7         So you might get, say, from a Spectrum, Charter

8    Spectrum account you might get 200 megabits downstream to your

9    house so can watch Netflix on several TVs at once, but you might

02:46  10   only get, you know, 30 or 50 megabits upstream.  So the problem

11   is if -- let's say you and I want to exchange a file -- well, I

12   want to get a file from you.  I'm limited.  Even though I can

13   download things with blazing speed, I'm limited to getting the

14   file by the fastest speed that you can upload.  And so that

02:49  15   makes things crawl to a halt, and it also means you can't be

16   sharing multiple files at once, et cetera.

17        So the insight of BitTorrent is, hey, why don't we

18   chop the files up.  Why don't we have the files stored on

19   multiple systems around the internet, or at least realize that

02:49  20   they are stored in multiple systems around the internet, chop

21   them up into segments, and I can grab one segment from system A,

22   one segment from system B, one segment from system C, and then

23   get the benefit of my fast bandwidth by being able to download

24   from several sources at once and you get the file faster that

02:50  25   way.

1    Q.   Can you describe briefly how computers connect to the

2    internet and maybe also discuss what an IP address is?

3    A.   Sure.  So one of the hard problems in computing in the '70s

4    was how do we get computers to talk to each other.  And what

02:51  5    came out of this, the sort of system that emerged and towers

6    above all others today is what's called the "internet protocol."

7    It's a series of rules or standards by which one communicates on

8    the internet.

9         And one of the challenges that it solves is how do we

02:52  10   route a message.  So let's say we have a network that spans the

11   nation or even the world, how do I get a message from one

12   computer to another?

13        And so the way this is accomplished is via IP

14   addresses and routing protocols.  But for the purposes of this

02:53  15   conversation, every machine that is connected to the internet is

16   assigned or associated with at least one IP address.

17        And when we are -- you can think of -- as the machine

18   sends messages across the internet, you can think of this as

19   being like the send and return addresses on a mail envelope.  It

02:53  20   has a "destination" IP address, each message does, and a "sent

21   from" IP address.  And so that when the guy at the other end of

22   the connection gets the message, he knows where to reply to.

23        So IP addresses are distributed more or less

24   geographically.  So we can -- by IP address, we can draw some

02:54  25   inferences about where a system is located in the physical world

16

1  and which internet service provider allocates it.  And this is

2  what allows investigators, when they find an IP address that

3  they think is associated with a crime, they can get an

4  administrative subpoena or some other mechanism that compels the

02:54  5  relevant internet service provider to disclose the identity of

6  the subscriber who was using that IP address at the time.

7  Q.  Okay.  So I'd like to talk a little bit about how

8  BitTorrent's a little different than maybe perhaps other

9  peer-to-peer programs.  So you've talked about these little

02:55  10  pieces of a file.  Would those be called "torrents"?

11  A.  So a torrent -- at least the way I think of it is, there's a

12  thing called a "torrent file" which is kind of like a recipe for

13  obtaining and assembling a given set of contents.

14          So, again, let's use the example of the latest Star

02:56  15  Wars movie.  It would list the -- for each segment of the file

16  some directions for where to find that and how to, once you've

17  got all the segments, how to assemble that into the finished

18  product.

19  Q.  And then -- so a torrent is basically a map that then helps

02:57  20  the computer receiving these different pieces to assemble them,

21  correct?

22  A.  Right.  It tells you -- it's kinda like a recipe.  It tells

23  you what ingredients to get and how to put them together.

24  Q.  Okay.  And, again, BitTorrent is decentralized?  There's no

02:57  25  central server or hierarchy, correct?

17

1   A.  Yes.

2   Q.  Okay.  I'd like to talk now about Torrential Downpour, or

3   what you call RoundUp, and how it modifies the normal BitTorrent

4   program.  Okay?  So first off, Torrential Downpour is not open

5   source, correct?

6   A.  Correct.  The source code is secret.

7   Q.  So, not publicly available from any other source, right?

8   A.  Correct.

9   Q.  Do you know anything about I guess the origin or who created

10  these programs?

11  A.  There are publications available, some of them authored by

12  the gentleman at the prosecution table, that describe its

13  creation.  It's a collaboration between law enforcement and some

14  computer scientists.

15  Q.  Okay.

16  A.  I couldn't name them right off the top of my head.

17  Q.  And that's fine.  I'm not asking you to name them.

18          There's certain things we do know about Torrential

19  Downpour that is different than the normal BitTorrent program,

20  correct?

21  A.  Yes.

22  Q.  Okay.  Is one of the differences what's called single source

23  downloading?

24  A.  Yes.  As I described earlier, the goal of BitTorrent was to

25  allow people to obtain files in pieces from multiple sources.

18

1    That was the point of it.

2            For law enforcement purposes, though, in order to

3    prove that a user has the entirety of one file, it's necessary

4    to get all of the segments from that one target computer.  So

5    one of the things that RoundUp is designed to do is obtain an

6    entire download from a single source.

7            So it's speaking the BitTorrent protocol, but doing so

8    in a way that sort of subverts the purpose of it.  It's not

9    breaking any rules, but it's definitely doing something out of

10   the ordinary and deviating from the BitTorrent standard.

11   Q.  And again, this isn't something a normal BitTorrent user

12   would do or how it would operate.

13   A.  It's not something a normal BitTorrent user would probably

14   want to do, since it just makes things go more slowly.  But,

15   yes, standard BitTorrent software would not be capable of doing

16   this.

17   Q.  Now, you mentioned earlier that it also might basically fake

18   file share so it doesn't get throttled down on the network.  Can

19   you explain that a little bit more?

20   A.  So one of the things that people quickly discovered when the

21   BitTorrent standard was first developed is that people would do

22   what's called "leaching."  They would come and download a bunch

23   of stuff, but they wouldn't be sharing anything.  So they would

24   be consuming BitTorrent resources but not contributing back.

25           So various efforts were made to force people to share

19

1    at least what they had downloaded, and maybe other things as

2    well, so that they weren't just a drag on the network; so that

3    they're contributing.

4         And so what you see is clients that aren't sharing

03:05  5    anything won't get preferential treatment in terms of downloads.

6    They won't get necessarily access.  Their ability to download

7    will be throttled.

8    Q.  And why would law enforcement not want to be participating

9    in the sharing?

03:05  10   A.  Well, there are a couple of reasons.  One would be, they

11   don't want to commit any crimes.

12        The other one -- I mean, that's probably the major

13   one.  But they probably also want to appear as though at least

14   from time to time they are sharing contraband because then

03:11  15   they'll get more interesting connections inbound to them.

16   Q.  And do you have any I guess speculation on how they could

17   hold themselves out as sharing when they're not, in fact,

18   sharing?

19   A.  Oh, you simply respond to search queries saying, yeah, I've

03:11  20   got this or -- you know, I don't know the exact dimensions of

21   the protocol that they're speaking.  You know, I don't know

22   exactly what messages they're sending, but they can advertise

23   what they've got.

24   Q.  Now, another difference is, does Torrential Downpour run

03:13  25   automatically?

20

1    A.  Yes.  We've learned -- well, automatically.  Presumably a

2    user launches it initially.  So it's maybe not fully automated.

3    But once it's on, it just sits and runs.  It runs around the

4    clock, unattended.

03:13    5    Q.  And do we know how that actually is carried out or what

6    means are used to do that, or is that something, again, that you

7    don't know?

8    A.  I mean, I presume, without firsthand knowledge, that it just

9    sits in a lab somewhere and runs.  It gets set up and launched

03:14    10    like any other process and it's left running and then people

11    check on it from time to time to see what it's found.

12    Q.  Okay.  Does Torrential Downpour also generate special data

13    logs?

14    A.  Yes, it does.

03:14    15    Q.  Now, how would we judge the reliability of those logs that's

16    generated by the same program that we don't have access to?

17    A.  I -- well, without access I have no objective way of judging

18    the accuracy of the logs.

19         So, for example, I've seen log files and they

03:15    20    oftentimes will describe events that can be verified via other

21    means; for example, in the context of a criminal case.

22         But what we don't know -- there's sort of confirmation

23    bias here.  What we don't know is how many log files are

24    generated that don't result in prosecutions, or how many

03:15    25    warrants are executed that don't result -- based on those log

21

1    files that don't result in prosecutions.  We don't have access

2    to that information so there's -- we don't have a way of

3    evaluating whether the system is accurate in general or not.

4    Q.  Does this kind of maybe implicate that you'd have a false

03:16   5    positive?  Is there -- can you describe what a false positive

6    might be in computer --

7    A.  Sure.  In testing -- in general, any time you have a test to

8    look for a condition, there are two kinds of errors that you are

9    worried about.  One is a false positive result.  In other words,

03:16   10   the system, whatever it may be, falsely reports the condition

11   exists.  The other one is a false negative.  The condition

12   falsely reports -- or, I'm sorry, the test falsely reports that

13   the condition does not exist.

14          And these are things which are tracked very carefully.

03:17   15   For example, in medical testing, you know, you have a test which

16   is 99 percent accurate for finding this kind of cancer.  What

17   they mean is there's 1 percent that they're getting either false

18   positives or false negatives and, you know, giving a

19   misdiagnosis potentially on that basis.

03:18   20          So here as well we know of times when the system has

21   given positive alerts, but we only know the ones that resulted

22   in prosecutions.  So we don't know the false-positive rate or

23   the false-negative rate of Torrential Downpour.

24   Q.  And the logs themselves again don't shed any light on that,

03:18   25   correct?

22

1  A.  Right.  They -- they report what the software reported.

2  They're a record of what the software reported.

3      And there's -- the logs themselves, you know, purport

4  to be accurate records of events that the software engaged in,

03:22  5  but we have no way -- or at least I have no way of verifying

6  their accuracy.

7      Other than, I will say, from time to time there are

8  events in a log that can actually be correlated with records of

9  events elsewhere or other sources of information.

03:22  10  Q.  Well, let's talk about this case.  So, for example, one way

11  that this supposed single-source download could have been

12  verified was that the image that the program said it downloaded

13  was found later on Mr. Owens' computer, correct?

14  A.  Correct.

03:23  15  Q.  And in this case did that happen?

16  A.  There was -- to my recollection there was an image that the

17  Torrential Downpour reported a single source download of and

18  that image was not found on any of the media seized.

19  Q.  Is another difference between Torrential Downpour and the

03:24  20  public version of the program is that Torrential Downpour can

21  get information from target computers like, for example, the

22  version that's being run of the program?

23  A.  Torrential Downpour is a BitTorrent client in the sense that

24  it speaks the BitTorrent protocol, but it's really a

03:24  25  surveillance tool.  It's designed for gathering information to

Case 1:18-cr-00157-WCG   Filed 08/30/19   Page 23 of 132   Document 25

1    be used in prosecution, and so it makes records of all kinds of

2    information that would be of no interest to the average

3    BitTorrent user:  IP addresses, software versions, segments of

4    files and so forth.

03:25   5         All of that information is used to a greater or lesser

6    extent by a BitTorrent client, but it's not exposed to the user.

7    The user has no knowledge of it.  The user just says, "ah, my

8    file got here" and is happy with that.

9         So that's -- that's a difference between Torrential

03:25   10   Downpour and other BitTorrent software, is that the other

11   BitTorrent software is designed for transferring files,

12   Torrential Downpour is designed for supporting interdiction.

13   Q.  Okay.  Is there any other I guess major differences you're

14   aware of that Torrential Downpour might have that the public

03:25   15   program doesn't?

16   A.  I don't believe it's an issue in this case, but I have from

17   time to time in warrant applications seen statements to the

18   effect that Torrential Downpour is capable of tagging a target

19   system.

03:30   20        So one of the other problems that can happen is in say

21   a home network there might be multiple devices, tablets, phones,

22   computers, these days thermostats, alarm systems, et cetera,

23   that all use the internet for communications.  And so one of the

24   problems is, well, how do we know which of these devices was the

03:31   25   one that was on the BitTorrent network?

24

1          And so presumably this involves the placement in a log

2     file somewhere of some piece of information that would be

3     uniquely identifying the system as this is the one to which law

4     enforcement connected.  But I'm not aware of that being in play

03:31    5     in this case.

6     Q.  Would a tag, if it was placed on a target computer, possibly

7     be in a nonshared portion of the target computer?

8     A.  It would possibly be there, yes.  I don't know the exact

9     mechanism of tagging.  But like I said, I assume it's probably

03:31   10     in a log file somewhere.

11     Q.  And again, without access to the program it's impossible to

12     say.

13     A.  A tag might be discernible, but, yes, it would be much

14     easier to figure it out if we had access to the program.

03:32   15     Q.  Okay.  Okay.  So, now, in this case you were hired by me,

16     correct?

17     A.  Correct.

18     Q.  And you reviewed all the digital evidence that was made

19     available by law enforcement.

03:32   20     A.  Yes.

21     Q.  And so did that include a mirror-image of the computer hard

22     drive --

23     A.  Yes.

24     Q.  -- that was seized from the search warrant?

03:32   25     A.  It did.

25

1  Q.  And also was there several thumb drives?

2  A.  Yes.

3  Q.  Okay.  And again, you also reviewed I think you said the

4  pleadings, like the indictment?

03:33  5  A.  Yes.

6  Q.  And also the police reports.

7  A.  Yes.

8  Q.  And the search warrant, correct?

9  A.  Yes.

03:33  10  Q.  Okay.  Now, after you reviewed all of this material did you

11  have several questions that caused you concern?

12  A.  One that I recall was that at least some of the single

13  source downloads seemed to happen quite quickly.  It's not rare

14  to see single source downloads or logs of single source

03:34  15  downloads -- I've never seen the single source download

16  itself -- but Torrential Downpour logs that describe single

17  downloads that take hours, or even maybe span more than a day.

18       Here at least some of them -- and I don't recall the

19  exact timeframes without refreshing my recollection, but some of

03:36  20  them were quite quick, on the order of less than a minute or

21  maybe even seconds.

22  Q.  And why would that be unusual?

23  A.  Well, again, the nature of the single source download is

24  that because you're downloading from a single source, you are

03:39  25  subject to whatever the upstream bandwidth limitations of that

26

1   source are.  So that's why it sometimes takes a while to get

2   files, because you're pulling it from a system that's only

3   uploading very efficiently.  It's maybe not the only consumer of

4   that upstream bandwidth and, in any case, it's limited by that

5   pipe size.

6   Q.  Was another one of your concerns about what the search

7   warrant meant when it said that law enforcement's investigative

8   focus was directed to Mr. Owens' IP address?

9   A.  Right.  So search warrant applications derived from

10  Torrential Downpour information are generally worded pretty

11  obliquely, I assume in order to avoid divulging sensitive

12  information about the software.

13          So I don't have any idea what it means to turn one's

14  investigative focus, what actions that implies.  I mean,

15  presumably at any point in an investigation one's focus is

16  somewhere, but I don't know what it means to turn one's

17  investigative focus towards a certain IP address.  I mean,

18  obviously it means I've seen an alert and so I'm taking an

19  interest in the IP address, but I don't know what actions the

20  investigator takes.

21          I also don't know concretely, you know, in technical

22  terms what it means to be associated with a certain hash value.

23  That would be another -- you know, we just don't know precisely

24  what it is that Torrential Downpour is basing its alerts on.  We

25  know the kind of stuff it is, but not exactly what.

27

1  Q.  And, again, to be clear, this could have been the program by

2  itself running automated that, you know, focused its

3  investigation or, you know, thought that this target computer

4  was associated with a torrent, not necessarily a person sitting

03:43  5  there looking over it, correct?

6  A.  Yeah.  Based on what I have read in this case and in others,

7  I think it's rare for someone to just sit there watching

8  Torrential Downpour.  What happens is they get a bunch of --

9  they come back in the morning, probably see a bunch of log files

03:44  10  and then start digging on those.

11  Q.  So in a sense, as far as the actual transactions that occur

12  between Torrential Downpour and the remote client or the target

13  computer, would it be fair to say that really the program's the

14  only witness to what happened at that point.

03:44  15  A.  Yeah, I think that's a good analogy.  The process of

16  identifying IP addresses in the language of the warrant

17  associated with a piece of contraband and conducting the single

18  source download is probably entirely automated and, you know,

19  was done unattended by a human.

03:45  20  Q.  Could the term "associated with a torrent" just means that

21  the target computer says, hey, I have this torrent or this map

22  to a file and not necessarily the file itself?

23  A.  I assume it means either I have it or I want it, and I don't

24  know for sure which.

03:46  25  Q.  But, again, could it be that it doesn't necessarily have the

28

1   file; it's just saying that it has the information or the

2   request for the file?

3   A.  Oh, certainly.  It might even be a false statement.

4           It's possible to imagine that someone, for example,

03:46   5   Torrential Downpour might untruthfully advertise what they have.

6   Q.  Okay.  Did you also have concerns when the search warrant

7   said that Mr. Owens' computer connected to law enforcement's

8   computer and what that might mean?

9   A.  Yeah, I would be curious to know exactly what that means and

03:47   10   what caused it to do so.

11  Q.  Okay.

12          MR. DONOVAN:  And, Judge, I'm getting towards the end

13  of my questions for Mr. Engel.

14  BY MR. DONOVAN:

03:47   15  Q.  So I guess I'd like to kinda conclude with, you know, why

16  you feel you need access to Torrential Downpour to answer all

17  these questions or to answer some of these concerns in the case.

18          So would it be fair to say that you need access to the

19  program to confirm whether Torrential Downpour actually

03:49   20  conducted a single source download the way that it says it does?

21  A.  Right.  I don't think -- I mean, the time of that particular

22  single source download has come and gone.  But I don't have any

23  way to verify how reliably Torrential Downpour conducts single

24  source downloads.  So that would be one of the things that I

03:49   25  would want to observe is sort of, in a controlled environment,

1    does it reliably get all of a file from a single source when it

2    reports that it's doing so.

3    Q.  And this would be important because whether or not the

4    entire file came from Mr. Owens' computer versus from multiple

03:50  5    computers, would obviously bear on his intent or his knowledge

6    of what occurred, correct?

7    A.  I don't know so much knowledge as just actual possession.

8    If someone has a piece of a file, that's different from having

9    the whole file.

03:50  10   Q.  And, again, that's, again, also maybe different from having

11   just the torrent for the file.

12   A.  Correct.

13   Q.  Okay.  Because, again, normal peer-to-peer protocol would be

14   a download from multiple sources, not just one.  So that would

03:51  15   be pretty crucial to try to figure out.

16   A.  Right.  So presumably the authors of Torrential Downpour

17   overrode that default behavior of the BitTorrent software.  And

18   the question is, did they do a perfect job of that or not.

19   Q.  Okay.  Are you also interested in knowing what network

03:51  20   traffic is monitored to identify potential target computers?

21   A.  Yes.  I would be interested to know the specific sorts of

22   messages that Torrential Downpour inspects.

23          We know that it discriminates between network messages

24   that involve hash values that are related to contraband.  In

03:52  25   order to do that, it's gotta be looking at the pool of messages

30

1    in general and then it alerts on the ones that are presumably --

2    their hash values are in a database of known bad files.

3            But, so it's -- effectively it's looking at all of the

4    traffic and then discriminating.  It's only alerting on some of

03:52    5    it.

6    Q.  So correct me if I'm wrong, but it sounds like it could be

7    doing like a dragnet search of all traffic across a peer-to-peer

8    network, at least in maybe a certain geographic area, to then

9    narrow down to what it thinks is contraband images or videos?

03:53   10    A.  Right.  In order to discriminate between contraband and

11    noncontraband, it has to get all of the messages.  It doesn't

12    see all of the BitTorrent traffic in the entire world, but it

13    certainly sees whatever is in its neighborhood and what it --

14    you know, whatever its peers are interacting with.  And it then

03:53   15    sifts through that to look for ones that are, you know,

16    potentially bad.

17    Q.  And this could maybe be important, for example, for raising

18    Fourth Amendment concerns?

19    A.  Well, one interesting question is, okay, there's this

03:54   20    database of -- of known hash values.  How do things get --

21    what's the process for adding things to that database?  How

22    rigorously are they vetted?  Is the database --

23            I mean, it's also easily possible to imagine this

24    database being used for discovering things other than child

03:57   25    pornography.  You could use it to look for hashes that are

1    associated with, say, recipes for bombs or things like that.

2    It's not just a -- it's a Swiss army knife tool in the right

3    hands.

4           And so, I mean, I'm not a criminal law practitioner so

03:57  5    I'll leave the Fourth Amendment arguing to you, but, yes, it

6    seems to me that this is -- the fact that it looks at both

7    legitimate and non-legitimate traffic in order to figure out

8    what the non-legitimate traffic is, you know, that is -- that

9    seems invasive to me.  But, again, I'm -- that's not the part

03:58  10   I'm an expert on.

11   Q.  Now, you also want to -- and we've talked about this a

12   little bit already with the false positives, but you want to be

13   able to have access to the program to test its accuracy and

14   reliability in how it carries out its methods, correct?

03:58  15   A.  Correct.

16   Q.  All right.  And this would be important because every

17   software program has certain parameters and instructions that

18   should be followed to make sure it's being used correctly.

19   A.  Right.  So the analogy I would make here is to say a radar

03:58  20   gun or a breathalyzer.  These are tools that are used to

21   establish probable cause to charge people with crimes or at

22   least ordinance violations.  And, but we know that they have to

23   be calibrated a certain way and they have to be used correctly.

24   And so defense attorneys routinely verify that that has been

03:59  25   done.  You know, it is a defense in many cases if the equipment

32

1    was not operated correctly.

2            And we have no way of knowing what questions to even

3    ask here, because we don't know how the software is set up, how

4    the software is installed, what the correct way of operating the

5    software is.  Those are all things that are opaque to us.  And

6    so we don't have any way of evaluating or even properly

7    questioning a prosecution witness about whether that took place

8    in this case or not.

9    Q.  Could you just describe briefly for the Court, if you were

10   able to get access to the program, like what are some of the

11   things that you might try to do or try to -- you know, what kind

12   of tests might you run?

13   A.  Well, one of them would be just what's called packet

14   capturing or packet sniffing.  I would attempt to watch from a

15   nearby place on the network a single source download and see if

16   indeed it all came from a single source.  Probably do that a few

17   times just to verify that it doesn't every so often grab a piece

18   from elsewhere.

19           I would also watch when the software generates an

20   alert what traffic caused it to do that.  That would -- those

21   would be things that would help me understand what it's doing

22   under the hood.  And that's kind of the goal here.

23   Q.  Now, would it matter where you did this testing or review,

24   whether it was at, you know, your own facility, your office

25   versus perhaps in a law enforcement office?

04:00
04:00
04:00
04:01
04:01

33

1    A.  I have no, you know -- it would be more convenient at my

2    office, but I have no, you know, principled objection to doing

3    it elsewhere.

4         I would say that if it were at another facility, I'd

04:01    5    probably want to schedule more than one visit because I assume I

6    would spend a fair amount of time getting up to speed on just

7    what -- how I would do the tests there.  You know, what's

8    available to me in terms of network ports or, you know, power

9    outlets, you know, sort of mundane things like that.  Also, just

04:02    10   learning how to -- I've never seen the software.  I don't know

11   what it looks like.  I don't know the first thing about how to

12   launch it or do anything like that.  So I'd need a little time

13   to just get oriented, and then I'd also need time to do the

14   tests.

04:02    15        So doing it at my leisure at my own facility would

16   make that easier, but it's not impossible to do it elsewhere.

17   I'd just need the requisite degree of access.

18   Q.  Now, would you view it as a problem if this was done

19   pursuant to a protective order where you can't disseminate or

04:02    20   discuss or otherwise disclose the program to anybody else except

21   for me?

22   A.  No, I believe we've even proposed that.

23   Q.  So you would obviously -- I mean, you're a practicing lawyer

24   in Wisconsin, correct?

04:03    25   A.  I am.

34

1    Q.  You value your law license.  You wouldn't do anything to

2    violate an order, right?

3    A.  I'd do my best to avoid that.

4    Q.  Okay.  Another reason that you might want access to the

04:03    5    program would be, again, to ensure that it -- when it identifies

6    a computer as flagged for possessing a torrent, okay?  That that

7    is maybe different than an actual child pornography image or

8    video, right?

9    A.  Right.  Now, this would be probably a dicey thing to test,

04:03    10   since I don't possess any child pornography and have no

11   intention of doing so, so we'd probably have to set up some way

12   of having a known, you know, safe file, you know, some dummy

13   file that we could pretend was something, you know, that

14   Torrential Downpour would alert on.  So we'd want to see when

04:04    15   that file gets shared what is it that triggers Torrential

16   Downpour to alert and do the log entries that it creates

17   accurately reflect the condition that was present on the

18   network.

19   Q.  You mentioned earlier, but I just want to maybe clarify this

04:04    20   a little bit more.  So it's virtually impossible for us as the

21   defense to prepare any sort of cross-examination of government

22   witnesses about how this program is used or whether it was used

23   correctly or within the right parameters, right?

24   A.  The best we have right now is what's in warrant applications

04:04    25   and then a few inferences we can draw from there.

35

1       There's a little bit of literature, you know,

2   presentations that one can download, but there's really not

3   much -- we don't have access to documentation about the system.

4   We certainly don't have the source code.  No one outside of law

04:05   5   enforcement to my knowledge has seen a working copy of the

6   software.

7       We get conceptually what it is, and we understand that

8   a system could be built to do what it claims it does, we just

9   have no way of verifying it.  And that makes it hard to know

04:05   10  what questions to ask, again, about whether the system was

11  properly installed, was it properly operated, what network

12  environment does it require in order to function correctly, did

13  it have that at the time.  These are all questions we don't --

14  since we don't know information about the guts of the system, we

04:05   15  don't know what questions to ask.  And we could ask a question,

16  but we wouldn't know whether the answer was helpful or not.

17  Q.  So would it be fair to say that your opinion is we are

18  basically at the mercy of the government right now of what they

19  say it does and doesn't do without independently verifying it?

04:05   20  A.  Very much so.  The -- we have nothing -- we just are -- we

21  either take on faith what's in the warrant application or we

22  don't.

23  Q.  And so there's really been no -- again, as far as you're

24  aware, and this is anywhere in the country -- any adversarial

04:06   25  testing of this program.

36

1   A.  I am not aware of any.  There are a couple of competitors to

2   Torrential Downpour also which are closely guarded.  I'm aware

3   of efforts in various courtrooms to get varying degrees of

4   access to Torrential Downpour and other systems.  I'm unaware of

04:07  5   someone getting unrestricted access to do just sort of thorough

6   testing.

7   Q.  And lastly, would it be important to gain access to the

8   program so that we can perhaps try to figure out why the file

9   that the program said it downloaded twice over the course of two

04:07  10   different days is not located on Mr. Owens' computer?

11   A.  Well, what we could do -- I mean, we know that the program

12   said it downloaded those things, and we know that the file was

13   not present at the time when the computer was seized.  We can

14   think of a variety of explanations for why that might be the

04:08  15   case.  Inspecting the software would help us evaluate sort of

16   which inferences are more plausible versus less plausible.

17          MR. DONOVAN:  Your Honor, I believe I'm done.  If I

18   could just check my notes for a quick minute here to see if I

19   missed anything.

04:08  20          (Brief pause.)

21          MR. DONOVAN:  Your Honor, I have no further questions.

22          THE COURT:  Okay.  Mr. Humble?

23                      CROSS-EXAMINATION

24   BY MR. HUMBLE:

04:12  25   Q.  Mr. Engel, you mentioned your background and training.  Have

37

1    you had any or received any training in BitTorrent file sharing

2    for the networks?

3    A.   Other than experiential testing, no.

4    Q.   Okay.  And you also mentioned that it sounds like what you

04:13   5    learned you learned from reading the literature and also doing?

6    A.   Yes.  For better or worse, people of my vintage typically

7    the courses weren't available at the time when we needed to

8    learn things, so we had to just go do it.

9    Q.   Okay.  And you mentioned that some of the literature upon

04:13   10   which you relied to teach yourself was authored by this

11   gentleman sitting next to me; is that correct?

12   A.   Yes.  You have next to you one of the probably half dozen

13   people in the world who knows most about the software.

14   Q.   Okay.  So if he helped teach you about what you know about

04:14   15   BitTorrent, do you have reason to trust his -- distrust his

16   expertise in this area with regard to BitTorrent Torrential

17   Downpour or Torrential Downpour Receptor?

18   A.   Curious question.  I don't distrust him.  No, I have no

19   reason to distrust him.  I mean, I don't think he's trying to

04:14   20   fool anybody.  I just don't have any objective way of verifying

21   any of the facts in this case.

22   Q.   But, again, what you've learned about this essentially, at

23   least in part, you've learned from this gentleman.  So you would

24   rely on his expertise in what you're testifying to here today

04:14   25   essentially.

1    A.   In part, yes.

2    Q.   And you referred to this in your -- in your affidavit as

3    "RoundUp" and you clarified "Torrential Downpour."  It's

4    actually Torrential Downpour Receptor, were you aware of that?

04:15  5    A.   I'm aware of that term as well.

6    Q.   Can you tell the Court the difference between Torrential

7    Downpour and Torrential Downpour Receptor?

8    A.   Not with specificity I cannot.

9    Q.   Okay.  And when you had the opportunity to review the logs

04:15  10   and the imaging of the computer, you said that you never found

11   this image that is alleged in the indictment; is that correct?

12   A.   That image as far as I could tell was not present on the

13   computer.

14   Q.   And I said "image" and earlier you said "image," but

04:15  15   actually, more correctly, it's a movie.

16   A.   Yes.  Yes.

17   Q.   Okay.  So you didn't find this movie, but you did review the

18   logs, correct?

19   A.   Yes.

04:15  20   Q.   And those logs did reflect that I believe there were 226

21   portions that made up the movie for lack -- I say "portions" for

22   lack of a better term?

23   A.   I'm taking your word for the number 226.  But, yes, the

24   movie was reflected in the logs.

04:17  25   Q.   And this will probably be an exhibit soon, but this log

1  essentially shows all 226 portions of that movie are going into

2  the computer of Mr. Owens; is that correct?

3  A.  That log is a document that speaks for itself.  I don't have

4  a way of assessing its accuracy, but it has entries that appear

04:17  5  to be what you describe.

6  Q.  Do you have a way of proving inaccuracies in the log?

7  A.  No.

8  Q.  Okay.  With regard to your review of the logs and the mirror

9  imaging of Mr. Owens's computer, did you find evidence that that

04:17  10  movie had been on Mr. Owens's computer?

11  A.  I saw an indication that it may have been there, yes.

12  Q.  And did you find indications that that particular movie with

13  that particular hash value may have actually been on Mr. Owens's

14  computer at different times throughout 2018, 2016, 2017?

04:18  15  A.  I don't believe -- or at least I don't recall, sitting here

16  today, seeing anything that gave me a sense of the time at which

17  it may or may not have been there.  I did find a reference to

18  the file name, but that's all I recall finding.

19  Q.  Okay.  And in looking at, again, the evidence, the computer,

04:18  20  the forensic evidence, were you able to establish essentially

21  any evidence -- or did you observe any evidence that the file

22  had been there prior to Mr. Owens's computer connecting with law

23  enforcement?

24  A.  Again, I don't recall what I saw being associated with a

04:19  25  time.  So I'm not -- one can always imagine a forensic analyst

1  smarter than oneself, so I'm not saying that there was

2  definitely no such evidence.  I just -- what I recall was

3  seeing a reference to the file name and I did not recall that

4  having any kind of timestamp on it.

04:19  5  Q.  And in reviewing that information did you -- well, I'll just

6  ask you:  Do you know what program Mr. Owens used to establish

7  peer-to-peer communication?

8  A.  It's in my notes, but I don't recall if it was Micro-Torrent

9  or what.

04:22  10  Q.  Okay.  And did you see any evidence when you were reviewing

11  the forensic materials that Mr. Owens had downloaded a

12  peer-to-peer program very close in time to when he connected

13  with law enforcement?

14  A.  There was peer-to-peer software installed.  That would have

04:22  15  had a timestamp on it.  I don't recall sitting here right now

16  the proximity.  I could refresh my recollection and I would -- I

17  don't -- I don't have any reason to dispute it.

18  Q.  Do you recall in reviewing that information that that

19  particular movie with its 226 portions was -- that there was

04:23  20  evidence that it was on Mr. Owens's computer after he

21  established contact with law enforcement?

22  A.  Again, the evidence I saw for the existence of that file, I

23  don't recall any time data associated with it.  So, no, I don't.

24  All I saw was the file name.

04:23  25  Q.  Well, let me ask you this.  If -- if there was evidence that

41

1    this particular movie was on Mr. Owens's computer prior to

2    connecting with law enforcement, and there was -- and I'm just

3    asking you to go with the question -- and there was evidence

4    that this particular movie was on Mr. Owens's computer after

04:23    5    connecting with law enforcement, would that be pretty good

6    evidence that that particular movie had been on Mr. Owens's

7    computer?

8    A.   If there was -- if there was evidence that the file was

9    present before connecting with law enforcement and evidence that

04:23    10    the file was connected -- was present after connecting to law

11    enforcement, would I infer that the file was present?

12    Q.   Yes.

13    A.   Yes.  If the file was present it was present.

14    Q.   So people can delete files, correct?

04:24    15    A.   Correct.

16    Q.   And you've been on other child pornography cases.  You've

17    testified you've done the research, looked at the forensics,

18    correct?

19    A.   Yes.

04:24    20    Q.   Have you seen other instances where individuals who have

21    contraband or child pornography have deleted the images after

22    viewing them?

23    A.   I have seen instances --

24         Well, let me answer it -- a two-part answer to that.

04:24    25    The short answer is, of course, people delete files from time to

1    time.  And sometimes you'll find traces of files in unallocated

2    space and those are presumably deleted files.

3            I am also aware of times when, as here, in the warrant

4    application there's a report of a single source download of a

5    file and we don't find it present on the target system when we

6    go to analyze it.  I don't know why that is.  Deletion is one

7    possible explanation, but another one would be a false positive.

8    Q.  This is going to come across very crude, because it is

9    crude, but it's a term that you may be familiar with and I'm

10   going to ask you:  Have you -- are you familiar with the term

11   "pump and dump"?

12   A.  No, I'm not.

13   Q.  Not with regard to child pornography or the downloading of

14   child pornography?

15   A.  That is -- that's not one I've encountered.

16   Q.  Okay.  In reviewing the forensic evidence here in this

17   particular case, was there a question in your mind that it was

18   Mr. Owens's computer who initiated contact with law enforcement?

19   A.  I don't know of a way from the forensic image to determine

20   that.  So it wasn't a question I particularly investigated

21   because I had no idea how to investigate it.

22           So I -- I'm not sure what would cause a computer to

23   connect to a law enforcement computer just in the abstract.  So

24   in that sense I wonder about it, but it was not something that I

25   investigated.

1    Q.  Are you familiar with the term "seeding"?

2    A.  Yes.

3    Q.  Could you describe for the Court what seeding is?

4    A.  In broad terms it's advertising the presence of files so

04:27  5    that you can -- you're participating in the network and people

6    know that you've got either whole files or at least segments of

7    files that others might want.

8    Q.  And seeding essentially -- well, sometimes, if not most

9    times, seeding is done by someone who already possesses an image

04:27  10   or a movie; isn't that correct?

11   A.  My understanding -- yes.  Yes, that's correct.

12            THE COURT:  This is s-e-e-d-i-n-g?

13            MR. HUMBLE:  Yes.  Seeding as in -- S, yeah.

14            THE COURT:  As in lawn seed.

04:27  15            MR. HUMBLE:  Yes, correct.

16   BY MR. HUMBLE:

17   Q.  So that seems counterintuitive.  If someone already has the

18   movie, why are they offering it out to the world?

19   A.  That's sort of the economic principle that's central to

04:27  20   BitTorrent.  What one downloads one ought to offer for sharing.

21   And that's sort of how the BitTorrent network maintains itself

22   as an efficient distributor of files.

23   Q.  So essentially that almost certainly is why the term is

24   called seeding.  So you just keep distributing and distributing

04:28  25   and distributing because you're hoping it's going to come back

1    to you.

2    A.  Not the same file, but --

3    Q.  Not the same file, correct.

4    A.  Yes.

04:28  5    Q.  Same genre.

6    A.  Well, genre even -- I think it's just bandwidth.  I don't

7    know that it discriminates by subject matter so much as just if

8    you're not offering things, then you're kind of a jerk user of

9    the system and you shouldn't get the benefit of it.

04:28  10   Q.  Okay.  And what is swarming?

11   A.  Swarming is another feature of -- I think it was first in

12   Gnutella.  It's a way of boosting the performance of downloads

13   of certain files.  I'm afraid, sitting here right now, I can't

14   go into much more detail than that.  I don't recall exactly how

04:29  15   swarming works on BitTorrent.

16         MR. HUMBLE:  I don't have any further questions,

17   Your Honor.

18         THE COURT:  Mr. Donovan?

19         MR. DONOVAN:  Just a couple follow-up, Your Honor.

04:29  20                    REDIRECT EXAMINATION

21   BY MR. DONOVAN:

22   Q.  So, Mr. Humble asked you about how part of your knowledge

23   and expertise of BitTorrent is based on the government's

24   witness, correct?

04:29  25   A.  Or documents authored by him.  I've never met him before

1   today.

2   Q.  Correct, I'm sorry.  To be more precise, documents authored

3   by him.

4   A.  Yes.

04:29   5   Q.  And again, I just wanted to clarify, there is no independent

6   access to this program.

7   A.  That's correct.

8   Q.  And so anything that's known about this program is either

9   what is chosen to be shared by its authors, including the

04:30   10  government witness, or that comes out through litigation.

11  A.  Yes.

12  Q.  Like, for example, in case decisions or, you know, opinions

13  and orders, things like that.

14  A.  Yes.  And one can glean tidbits here and there from things

04:30   15  like warrant applications.

16  Q.  So I guess my question -- you might be -- you know, where

17  else could you go to learn about this?  Other than perhaps

18  publications by the government witness.

19  A.  If I knew of another place I'd go there.

04:30   20  Q.  Okay.  The government asked you questions about whether you

21  have any reason to doubt that the logs are inaccurate.  Okay?

22          Again, why can't you assess the logs separate from the

23  program?

24  A.  Well, the log is just a text file.  Sitting at my computer

04:31   25  with a Notepad application, I can make a text file that says

1  darned near anything.  I don't think the government is

2  generating false text files.  That's not -- I'm not that much of

3  a conspiracy theorist.  But it seems to me antithetical to the

4  idea of criminal defense that we should just take it at face

04:31  5  value.  It seems that we should be able to do some investigation

6  of the degree to which it accurately reflects the events that

7  it's reported.

8  Q.  Would it be fair to say that if there's problems within the

9  program itself then there might be problems within the logs

04:31  10  themself?

11  A.  Right.  That's the old "computer garbage in/garbage out"

12  theory.  If the software does not function as designed, then

13  there's no reason to expect that the logs would be better than

14  the program itself.

04:32  15  Q.  You testified that again you reviewed the forensic evidence

16  available in this case personally.

17  A.  Yes.

18  Q.  And you found indications of perhaps the file name of the

19  movie that was supposedly downloaded on Mr. Owens' computer.

04:32  20  A.  Correct.

21  Q.  But no actual file.

22  A.  Correct.

23  Q.  And I apologize, I forget, did you find any indications of a

24  hash for that movie?

04:32  25  A.  I did not.

1    Q.   Okay.  Now, part of these peer-to-peer programs would be,

2    again, a search function where like a term could be entered,

3    correct?

4    A.   Yes.

04:32    5    Q.   And so would that be part of a Torrent?  So like could a

6    search term or a function be part of a Torrent that might be on

7    the computer?  Meaning that, you know, it might say it's looking

8    for or has information on it but, again, doesn't have the file

9    itself?

04:33    10   A.   Yes.  One can find, for example, Torrent files on a

11   computer, but not the -- not the movies or images or whatever

12   that the torrent files would enable you to acquire.

13   Q.   Okay.  And so, again, you said one explanation could be, as

14   you acknowledged, that the user deleted the file, right?

04:33    15   A.   Yes.

16   Q.   But another explanation could be, again, this idea of a

17   false positive that perhaps Torrential Downpour reporting a

18   single source download was just wrong; that there -- you know,

19   it reports a download, but there never was a file there to

04:34    20   download from.

21   A.   Correct.

22   Q.   Okay.

23          MR. DONOVAN:  I don't have any other questions,

24   Your Honor.

04:34    25          THE COURT:  Okay.  Thank you, Mr. Engel.  You can step

48

1    down.

2              (Witness excused at 2:44 p.m.)

3              THE COURT:  How about a short break.  Do you have -- I

4    mean, are we in a rush because a witness has to catch something

5    or get out of here or --

6              MR. ERDELY:  6:45.

7              MR. HUMBLE:  We've got some time, Your Honor.

8              THE COURT:  6:45?

9              MR. HUMBLE:  It's Green Bay, we can get him over

10   there.

11             THE COURT:  20 minutes.

12             (Recess taken at 2:45 p.m., until 2:58 p.m.)

13             THE CLERK:  Please raise your right hand.

14             Do you solemnly swear the testimony you are about to

15   give is the truth, the whole truth and nothing but the truth so

16   help you God?

17             THE WITNESS:  I do.

18             THE COURT:  Please state and spell your first and last

19   name for the record.

20             THE WITNESS:  Robert Erdely, E-r-d-e-l-y.

21             THE COURT:  Thank you, Mr. Erdely.

22             Go ahead, Mr. Humble, you may proceed.

23             MR. HUMBLE:  Thank you.  May I approach the witness,

24   Your Honor?

25             THE COURT:  You may.

49

1    ROBERT ERDELY, GOVERNMENT WITNESS, DULY SWORN

2    DIRECT EXAMINATION

3  BY MR. HUMBLE:

4  Q.  Mr. Erdely, I'm just going to hand you what's been marked as

5  Exhibit 1, can you just tell me what that is?

6  A.  It's a copy of my CV.

7    (TRANSCRIBER NOTE:  Mr. Humble not near a microphone.)

8  Q.  [Indiscernible]?

9  A.  I did.

10    MR. HUMBLE:  [Indiscernible].

11    MR. DONOVAN:  No objection.

12    THE COURT:  1 is received.

13    (Exhibit 1 received in evidence.)

14  BY MR. HUMBLE:

15  Q.  If you could go ahead and just inform the Court, what is

16  your background, who is your employer, how long have you been

17  employed, that kind of thing?

18  A.  I worked for the Pennsylvania State Police until I retired

19  in 2012.  The last five years of that career I supervised the

20  Computer Crime Unit.  And it was during my time with Computer

21  Crime Unit that I worked on the development of these tools with

22  the University.

23    And, April 2012 I retired and the very next day I

24  started with the Indiana County Detectives Bureau where I kept

25  the same role — computer crime investigations, which is both the

1    investigative piece and the forensic analysis piece.

2            So as part of that and my time with Computer Crime

3    Unit, I went through various trainings, conferences and such

4    where I was able to acquire professional certifications.  For

07:21  5    instance, the CISSP certification the defense expert was

6    speaking of, I obtained that.

7            I'm a Microsoft certified systems engineer, a Cisco

8    certified networking professional.

9            I went through the certification process for four --

07:25 10    four different certification processes for computer forensics.

11    And, again, just the ongoing training day to day.

12            As it relates to peer-to-peer, much of my training

13    came from the University, the researchers, the professors and

14    Ph.D.'s that did the research into the network so I could learn

07:26 15    exactly how it operates.

16    Q.   Okay.  Just total, how many years have you been dealing in

17    investigating computer crimes?

18    A.   I started with the Computer Crime Unit October 1998 to

19    present.

07:26 20    Q.   Okay.  And is it fair to say that now you split your time

21    between investigations and training and testifying?

22    A.   Correct.  I do trainings for the Internet Crimes Against

23    Children Task Force, for the FBI's Violent Crimes Task Force,

24    their international task force.  I've done a training for

07:27 25    Interpol and various different countries.  I provided this

51

1    technology beyond the United States.

2    Q.  So as you say, you've trained on BitTorrent and the

3    investigative use of BitTorrent in other countries.  How many

4    countries use this investigative Torrential Downpour?

07:28    5    A.  We last checked, over 60 countries used our investigative

6    systems.

7    Q.  And if you could just kind of describe for the judge when --

8    in defense affidavit and probably in your resume, it references

9    Amherst is where this particular software was developed.  Sounds

07:28    10   like you were in on the ground floor.  Can you explain that to

11   the Court?

12   A.  Yes.  Initially there was research done by a professor from

13   University of Massachusetts Amherst, and a professor from

14   Georgetown University.  That was the initial discussions as to

07:29    15   where we move next as law enforcement for investigations.

16          After that, I worked, you know, day in and day out

17   with the senior programmer at University of Massachusetts

18   Amherst where we did the development of the software.

19   Q.  So you didn't author the software.

07:29    20   A.  No.  I was part -- the development team was myself and the

21   senior programmer from UMass.

22          There's a lot of back-end work that relate to other

23   aspects and other networks that we investigate that I programmed

24   in that area.  I'm a Microsoft data -- Certified Database

07:29    25   Administrator, so I work with the databases and things like

52

1    that, as well as the actual individual testing of the software

2    before it's deployed.

3    Q.  Okay.  So fair to say you're very familiar with Torrential

4    Downpour.

07:30    5    A.  Yes.

6    Q.  Okay.  And Torrential Downpour Receptor?

7    A.  Yes, sir.  Those are two separate programs.  And this case

8    relates to one, which is Torrential Downpour Receptor,

9    specifically version 1.50.

07:30    10    Q.  Okay.  We've heard about the basics of BitTorrent from the

11    defense expert.  Is there anything that you want to clarify or

12    put a little more focus on for the Court with regard to how that

13    operates?

14    A.  Just quickly a high-level -- I just want to make sure the

07:31    15    Court has a good understanding as to how things worked.

16        BitTorrent is different as was already described.  One

17    of the major differences is that the torrent file that we've

18    heard about is a set of instructions on how to get the actual

19    files that they describe.

07:31    20        Well, you have to search outside websites or get them

21    from other people.  The BitTorrent software, although it gives

22    you a mechanism to type and search as described, I just wanted

23    to clarify the BitTorrent file sharing network doesn't have a

24    searching component built in.  When I type in the little search

07:32    25    field in this program, which is my BitTorrent software,

07:32

07:33

07:33

07:34

07:34

1   typically what happens is a web browser just pops up and starts

2   giving you your search results.  Well, you could have skipped

3   that whole step and just went to your web browser, opened up

4   Google, and started searching that way.

5          So I just wanted to be clear that there is no

6   mechanism to search by file name within the BitTorrent file

7   sharing network.  So that was a little bit different.

8          The second -- so after I get the instructions I search

9   the internet and I find a torrent file that describes the

10  content I'm looking for.  Then you load that torrent --

11  Q.  Can I just stop you there?

12  A.  Yes.

13  Q.  We're talking in the abstract.  What might one put into this

14  to find the type of movie or image they are looking for?

15  A.  "Jurassic Park movie torrent."

16  Q.  Okay.

17  A.  If I just use those four key words I would be presented with

18  lots of sites that have these instruction files, these torrent

19  files that would enable me to download Jurassic World or any of

20  the other new movies that are out there.  But you have to start

21  by finding these instructions outside of the BitTorrent file

22  sharing network is my point.

23  Q.  Okay.  So now I found these websites, and I'm assuming the

24  same holds for erotica or child pornography or any type of other

25  file?

54

1    A.  Yes, sir.

2    Q.  I found this, I found what I want, how do I go about getting

3    it with the BitTorrent?

4    A.  So now what happens is you load that torrent file into your

07:34    5    BitTorrent program.  Much like if you wanted to open up a Word

6    document.  You can either double-click it and it will launch the

7    program and load the Word file you were trying to view.  Well,

8    with BitTorrent it's similar, I can double-click the torrent

9    file and, assuming there's an association between those two, it

07:35    10    just opens up my BitTorrent program and starts working.

11        Or you could have it already open and choose the

12    drop-down file, open, and you just navigate to that torrent file

13    which are the instructions.  But in either case, once the

14    torrent file, the instruction gets loaded into the program,

07:35    15    searching does happen.  And what searching happens is, that now

16    my computer, running a BitTorrent piece of software that has

17    instructions loaded, it goes out to the BitTorrent network.

18        There's indexing that happens.  So the BitTorrent

19    network keeps track of who is associated with which torrent.

07:36    20    Because if I load a torrent, I need to find other people that

21    have some or all of that material to share with me.  I just

22    started, I have nothing to share.

23        So the BitTorrent network does that all by itself.

24    And it's just a search for a torrent that I've now loaded into

07:36    25    my program which is different than initially finding that

55

1    torrent.  They are two separate things.

2    Q.  So when you say it does it all by itself -- I guess that was

3    a corny commercial where they said "set it and forget it"?  I

4    mean, is that what we're talking about?  You've already told it

07:36   5    what you want and you can just walk away and it's going to ask

6    all of the people all over the world through the internet to

7    give you pieces of what you want?

8    A.  Correct.  I load it into my program, assuming that all the

9    [Indiscernible] are in place, it's going to learn a list of IP

07:37  10    addresses that potentially -- that have shown this association,

11    they've communicated on the BitTorrent network asking about the

12    same torrent file.  So they basically are matchmakers at this

13    point.  The BitTorrent network says this is the torrent you're

14    looking for, I understand that, here's a list of 40 or 50 IP

07:37  15    addresses that also show that association.

16          Well, at the point -- and this is very important -- at

17    the point in time where my computer has interacted with the

18    BitTorrent file sharing network and expressed interest in this

19    torrent file, which is identified through caching like the Court

07:38  20    has already heard, a very unique way to identify content.

21          So it will keep track of the fact that I asked that

22    question.  So my computer had -- my BitTorrent software, I

23    loaded a torrent file into it, I've made an inquiry to the

24    network, now the network knows about me.  I have an association.

07:38  25    And it could be me, Rob Erdely the law enforcement officer, or

1    any other BitTorrent user in the world.

2           So the next thing that happens is, I will start trying

3    to connect people to get pieces of the file or files -- because

4    it could be one file or many files described by a torrent -- and

5    hopefully get to connect to people.  And at the point in time we

6    connect, what happens with this BitTorrent file sharing network,

7    there's some handshaking that goes on.  It's just a computer

8    term, but basically we're just gonna have a little conversation

9    before we start creating data.  And one of the very first things

10   that happens is, regardless of whether I initiated the

11   connection to you or you initiated the connection to me, we

12   first have to agree upon one thing:  That we're talking about

13   the same torrent.

14          And the torrent's identified through something called

15   an "info hash," but very simply it's a very, very, very unique

16   way to identify it.  It's more unique than DNA is to the human

17   body.  That's how unique it is.

18          So we agree we're talking about the same torrent.  And

19   then the next thing that happens is, both computers, regardless

20   of -- if I contacted you because I needed pieces of data, or if

21   you contacted me because you needed pieces of data, in either

22   case both sides are required to report, "These are the pieces I

23   have to share," and the other side says, "These are the pieces I

24   have to share."

25          Because BitTorrent is built on the premise it's a

57

1    tit-for-tat exchange.  You're supposed to be able to give pieces

2    of data to a person that is connected to you to download data,

3    as well as receive.  You're supposed to give and get, all

4    through the same connection.  And it's an automatic thing that

5    happens.

6    Q.  Let me ask -- let me stop you there.  Sorry.

7         Do I always need to go to 50 or 100 different people

8    to get little pieces?  Can I not just get the Jurassic Park

9    movie I want from one person?

10   A.  You could and do at times on the BitTorrent network using

11   any software, not law enforcement, nothing specific.  The

12   network allows for the entire content to be downloaded from a

13   single IP address.

14        But, it is true that you will speed up your download

15   times if you reach out to two, three, four, 10 or 20 different

16   computers, because all of them could be giving you data at the

17   same time.

18        But, just to put it in perspective, if I'm -- if I

19   load a torrent into my BitTorrent program and I'm seeking to

20   download that material and there's only one person online that

21   has it available at that moment in time, then the entire

22   download happens from a single sharing computer.  It's nothing

23   unique to law enforcement software that downloads happen from a

24   single sharing client.

25        Additionally, if you think about the person that had

1    to create this collection of data to share, no one else in the

2    world has it.  I'm creating this unique collection of files.  So

3    there's a process within your BitTorrent software to create that

4    instruction file, that torrent file.  So when I start sharing

07:43    5    that torrent file out and people want to start downloading it,

6    there's only one person in the world that has that collection of

7    files, me, the creator, until I start sharing it out.

8          So my point is, the fact that law enforcement does a

9    download from a single sharing IP address is not unique to law

07:44    10    enforcement.  It happens naturally on the BitTorrent file share

11    network on a daily basis.  So....

12    Q.  So is that the conclusion of your overview of BitTorrent?

13    A.  No.  So then I just learned to go a step further.  There was

14    already a definition given for seeding and I just want to make

07:50    15    sure the Court understands exactly what seeding is.

16          So if I loaded a torrent into my BitTorrent software

17    and I downloaded everything, now I have all the files that are

18    described by that torrent file.  I need nothing more.  That's

19    the moment in time you become a seed.  If you are seeding a

07:50    20    torrent, you're in a position where you've -- you possess it

21    all.  And you're staying online for the purpose of continuing to

22    seed the data, like a farmer in a field throwing seeds to grow

23    his crops.  Because a torrent and its associated data will only

24    be available assuming there's enough BitTorrent programs online

07:50    25    around the world that have those pieces to share.

1    Well, so now that I have it all, this is the point
2    that I'm trying to bring out, I am making myself --
3    (TRANSCRIBER NOTE:  Witness moves away from microphone
4    or microphone not functioning.)
5    -- available to anybody looking for that torrent and I
6    will share the data for them.  But it's important to understand
7    this.  I'm not just sitting here passively waiting for people to
8    find their way through the internet to connect to my computer.
9    That certainly is one of the two possibilities.
10   Someone loads a torrent, they want to find a down -- someone to
11   download it from, the BitTorrent network, the index tells them
12   about my IP address, so they connect to me.  And I'll give them
13   the pieces they request.
14   Again, I don't need anything, I have everything, so
15   that whole tit for tat stage is gone, it's out the window.  But
16   there's another thing that happens, and a lot of people don't
17   realize it [Indiscernible].
18   I don't just sit there as a seed on the BitTorrent
19   network when I have everything and just sit passively waiting.
20   No.  I created the index and look for people that are still in
21   need of some of this material I have.  I'm being overly helpful.
22   I will make outbound connections from my computer -- when I say
23   "I," I'm talking about the BitTorrent [Indiscernible] I
24   apologize.  I'm not trying to infer that the person
25   [Indiscernible] to make it happen.  But the BitTorrent network,

1    I'm a seed, will continually query the network looking for new

2    IP addresses that are in need of data.  And I'm going to deliver

3    it to them.  I'm going to knock on the door and say, "I heard

4    you need some of this data" and offer it up to them.

07:54    5        So it makes outbound connections to computers all

6    around the world and it continues to share, and it didn't

7    require that computer to reach into my BitTorrent software and

8    make the request.  I'm delivering it to you.  It's home delivery

9    so to speak.

07:55    10    Q.   Okay.  So when all this is happening, this happens

11    automatically if the computer is on and connected to the

12    internet?

13    A.   Correct.  As long as it's connected to the internet and it's

14    running the BitTorrent software and until the person chooses to

07:55    15    stop the sharing or seeding process, it would continue operating

16    that batch.

17    Q.   And the handshake, the handshake takes place mutually, for

18    lack of a better image, outside of each computer?  I mean, no

19    one's intruding each other's computer to go ahead and do that,

07:56    20    is it?

21    A.   No, it's expected.  The two computers have something called

22    a TCP connection.  It just -- think of it like a tunnel.  There

23    isn't a connection established or even a phone call.  I pick up

24    the phone and I dial your number and you have a phone, we have

07:56    25    an established connection, I can talk to you and you can talk to

1    me.  That's what happens on BitTorrent.

2           So either I connect to the computer or the computer

3    connects to me, but at that point we have this open line of

4    communication.  And again, the first thing that's gonna happen

07:57    5    is, we're going to agree that we both are talking about the same

6    torrent.  Because if we're not, the conversation's over.  He

7    could have stopped sharing.  He could have stop [Indiscernible]

8    seeding [Indiscernible].

9           The next thing that happens is handshake.  And that's

07:58    10   where one BitTorrent program can talk to the other BitTorrent

11   program and tell each other:  I'm running a BitTorrent program

12   called BitComet, and I could respond I'm running a BitTorrent

13   program called UTorrent.  Those are both real clients.  So

14   that's part of the handshake.

07:58    15          It's available to any program.  As a matter of fact,

16   the off-the-shelf, so to speak, clients tell you that.  Or if

17   there's a tab that says peers and you can see their IP address,

18   you can see the version of software that they told us that they

19   were running.  It's part of the normal everyday communication,

07:59    20   that handshaking.  It tells us what networking port they listed

21   on, all those sorts of information.

22   Q.  Okay.  So Torrential Downpour Receptor, which is the program

23   we're talking about here with regard to Mr. Owens, how does that

24   differ from the BitTorrent -- or does it differ from the

08:00    25   BitTorrent that you just described?

62

1    A.  Well, it's using just the functions I just described.

2    Obviously we're law enforcement, that's not a surprise.  But the

3    way BitTorrent -- I'm sorry, Torrential Downpour Receptor works

4    is that it searches for torrents files, the instructions, that

08:00    5    are known to law enforcement.  And who is the person that

6    decides whether it is something we search for or not?  It's me.

7          And we learn that through the hashing of the files and

8    comparing it to other [Indiscernible] location of files we know

9    about, or at times I actually have to physically download the

08:01    10    file and look at them and say that's an eight-year-old, it's a

11    sex offense, we're going to include this on the torrents that we

12    investigate.

13          We do not listen in -- listen or monitor or try to

14    discern one type of traffic from another.  We simply search for

08:01    15    a torrent to learn the IP addresses of other -- others who have

16    shown an association with that torrent, and we receive the

17    search results relating to what IPs are present.  We do not -- I

18    don't even know how you would do that -- sit there and somehow

19    sniff out or monitor all BitTorrent traffic.  It's a

08:02    20    decentral -- decentralized network.  That would be an incredibly

21    difficult thing to do if it's possible at all.

22          We are just doing the same messages out that any

23    BitTorrent program would give and receiving responses back.

24    [Indiscernible] receptors you need, because all we're doing is

08:03    25    searching for torrents that relate to child exploitation and

63

1    then we sit there.  We just sit.  We're gonna sit and wait.

2          And because I searched for that torrent, remember, the

3    BitTorrent file sharing network knows my IP address

4    [Indiscernible], my law enforcement IP.  And the BitTorrent

5    network is going to tell others about me.  I'm just gonna sit

6    and wait.

7          And that's what happened in this case.  The suspect

8    computer or the user's computer, however you want to define

9    that, loaded a torrent into their BitTorrent program.  The first

10   step happens where they inquire on the network [Indiscernible],

11   what IPs might I connect to that also have an association with

12   this torrent?  And the suspect computer learns my law

13   enforcement IP address and he, or she, connects to us.

14         That's analogous to the drug dealer driving his car to

15   the police station, going to the front desk and, any police

16   officers here want to buy crack?  Because that's what happened.

17   The suspect computer arrived to law enforcement's computer, the

18   TCP connection happens, we both agree that we're willing to talk

19   about the same exact precise torrent, and now both sides, the

20   person that contacted the investigator and the investigator

21   contacted the person who established the connection, we get to

22   talk freely about that torrent.  What pieces do you have to

23   share, the law enforcement computer can ask the suspect

24   computer, and vice versa.

25         So we're law enforcement, we do not share.  And we

1    don't even have to lie.  They ask us what pieces we have to

2    share, we say zero.  We have none.  That's a completely

3    acceptable message on the BitTorrent file sharing network.  And

4    then the sharing computer will tell us what pieces they have to

08:06   5    share.

6           So here's what happened in this case as

7    [Indiscernible] reading the law.  The suspect computer was

8    seeding.  They had all the pieces.  They didn't need anything

9    from law enforcement.  They connected to us through the overly

08:07  10    helpful image sharing, like I previously described, and once we

11    were connected we just started asking for the pieces of the data

12    that the sharing client was making available.  And all that gets

13    memorialized in a log file by Torrential Downpour Receptor.

14    Q.  Okay.  And you've reviewed those log files prior to your

08:07  15    testimony here today?

16    A.  Yes, I have.

17    Q.  And we've brought a couple with us?

18    A.  Yes.  The two in question that were two downloads of the

19    same file spanning two different days.

08:08  20    Q.  Okay.

21           MR. HUMBLE:  May I approach, Your Honor?

22           THE COURT:  You may.

23           MR. HUMBLE:  And counsel has these.

24    BY MR. HUMBLE:

08:08  25    Q.  Handing you what's been marked Exhibits 2 and 3, they seem

1  to be quite similar, could you explain to the Court what they

2  are and why they're different?

3  A.  Well, this is two different investigative sessions.  Every

4  investigative session -- every time we accept a connection from

08:08  5  a person -- a person's computer, it gets compartmentalized in

6  its own folder.  It lives all by itself.

7          And on two different dates, the same IP address

8  connected to the law enforcement computer, possessing all of the

9  content in complete possession of this movie file, and offered

08:09  10  to share it because that computer was, quote-unquote, seeding.

11          And that's what happened in these cases.  And the

12  reason there's two log files is because the first investigation

13  began on May 21st, 2018.  The download happened quite quickly,

14  as the Court's already heard.  And then the next day on May

08:09  15  22nd, the early-morning hours of May 22nd, that computer still

16  had that material to share and was still offering to share it to

17  the world.  Just fortunate for law enforcement that that

18  computer chose to connect to law enforcement's instance of the

19  BitTorrent piece of the file.

08:10  20          MR. HUMBLE:  May I approach again, Your Honor?  I'm

21  sorry.

22          THE COURT:  You may.

23  BY MR. HUMBLE:

24  Q.  I'm going to hand you exact duplicates of what you have

10:25  25  there so the Court has a copy and [Indiscernible].

66

1    A.   Thank you.

2    Q.   And obviously these are detailed logs.  So I don't want you

3    necessarily to dwell on each line, but there's highlighted

4    portions.

10:25    5         Could you explain for the Court the significance of

6    the highlighted sections, why you chose to highlight those and

7    what that essentially means with regard to the program and the

8    memorialization of the program?

9    A.   Sure.  And so just for the sake of being on the same log at

10:25   10   the same time, let's just describe a download dated May 21st,

11   2018.

12   Q.   Which will be Exhibit 2.

13   A.   Which is Exhibit -- I don't have -- yeah.

14   Q.   You don't have that.

10:26   15   A.   Okay, Exhibit 2.  So if we all look at that one, then I can

16   explain the highlighted portion.

17        So on May 20th of -- the first highlighted portion on

18   page 1, it says, "Remote client at IP address 104.11.97.37 has

19   connected to us."

10:26   20        Again, there's two possibilities why some BitTorrent

21   computer would connect to us.  That's either, A, he's seeking to

22   find pieces he's yet missing, but he'd still share what he had,

23   or he's seeding.  I have it all, I want to be overly helpful,

24   I'm going to give this data freely to anyone on the BitTorrent

10:27   25   file share.

1      So I know that a computer is connected to me, but I'm

2  not really sure why until we start communicating.  So the second

3  highlighted area, "info hash sent by remote client."

4      So the computer that connected to us has to tell us

5  why are you even talking to me.  Well, I'm talking to you about

6  a very specific torrent, and that has a hash value, it's called

7  an info hash, uniquely identifying that torrent.  There can be

8  no duplicate.  It's the same -- the odds are astronomical, it's

9  one -- it's two to the hundred and sixtieth power, or one in 1.4

10  quindecillion, which is one with 48 trailing numbers.  It's a

11  very, very large number.

12  Q.  So that number that begins 0833, that is the hash value?

13  A.  That's the info hash.

14  Q.  Info hash?

15  A.  It's the hash of the information, the instructions unique to

16  that torrent.  And that's going to be the only payload or

17  content it could describe is that file that it was meant to help

18  you download.

19  Q.  And that second highlighted portion appears to be occurring

20  at essentially the same exact time as the initial connection?

21  A.  Yes, it happens.  We're talking about computers.  It happens

22  very, very quickly.  Right.

23  Q.  Okay.  So what's that next highlighted portion mean?

24  A.  The next thing that happens is, handshake data.  And this is

25  where the computer that is connected to us is telling us more

68

1  information.

2      Now, we know the torrent that they connected to us

3  about, but in the extended handshake it's telling us things like

4  they're listening port.  So if we ever wanted to connect back to

10:30  5  them, you need to know not only just an IP address but also a

6  networking port.  So P equals and then you see a number, that's

7  their networking port.

8      REQQ, that sands for request Qs.  It tells us how many

9  pieces are we -- I'm sorry, how many packets are we permitted to

10:31  10  ask for at any given moment in time.  If it's included, we're

11  supposed to abide by that value and we do.  And you'll see that

12  here in a minute.

13      It tells us the version of software they're running.

14  This is something they offered to us in the extended handshake.

10:32  15  It's given to any BitTorrent client, not just us.

16      And then it actually tells us our IP address, your IP.

17  That means they're detailing in the handshake who they connected

18  to.  Just so there's no misunderstanding, I meant to connect to

19  -- whatever IP address was listed.  That would have been the law

10:32  20  enforcement officer.

21      And then the next highlighted portion is why I know it

22  was seeding and needed no data from law enforcement or it would

23  even think to ask for any data from law enforcement or any other

24  BitTorrent client, because the next section says remote client

10:33  25  has all 226 pieces.  You have to download 226 pieces of data

69

1  before you would be in possession of the entire movie file.

2  Q.  And I'm sorry to interrupt, but you'd have to -- based on

3  what you previously said, you'd have to do that 50 pieces -- 50

4  packets at a time?

10:34   5  A.  50 packets at a time is how you have to request them, yes.

6  Q.  Okay.

7  A.  So, and just to put it in context, that's about 50 -- just

8  over 50 megabytes.  So it's actually a small file as far as

9  movies go on BitTorrent.  50 megabytes is not that large.

10:46  10  There's hundreds of megabytes of data that's shared in a single

11  movie file.

12  Q.  So here we've been talking about abstract kind of strings of

13  alphanumeric -- alphanumeric strings, it looks like in the next

14  highlighted portion we're actually start talking about the

10:47  15  movie's name that you would see on the computer?

16  A.  Correct.  Now, it's inside of the torrent.  The instruction

17  files knows how to name it.  It takes the name of the creator.

18  Whoever first shared this content on the BitTorrent file sharing

19  network, it takes that name.

10:48  20  Q.  Okay.

21  A.  And the file name is -- and it's long, I don't know -- it's

22  on everyone's sheet of paper.  022 Asian-VPHC.  It appears in

23  the quotes.  That's the file name.

24  Q.  Okay.

10:49  25  A.  And then the downloads begin in the next highlighted

1    section, it says, "Sent 50 requests."  Well, that's because of

2    the extended handshake.  The sharing client that came to us to

3    share child pornography said you're allowed to ask for 50

4    packets at a time.  So that's what we did.  We asked for 50

5    packets.

6         And then we started asking for the packets and they

7    get received, line by line.  I've requested a packet, it's

8    received.  I requested a packet, it's received.  Had to happen

9    226 times before the investigator would have the entire payload.

10   So....

11   Q.  And are -- on the next -- geez, I don't know how many pages,

12   17 pages long -- in the next series of pages, is that what

13   you're detailing, that each piece going up to 226 --

14   A.  Correct.

15   Q.  -- this log reflects that it's been successfully received?

16   A.  Correct, yeah.  And it's just a couple minutes is all that

17   it took.  And then you don't see any more highlighting until

18   page 11 of 17.

19         So, to put it in context, a computer on the BitTorrent

20   file sharing network came to us and we agreed we're willing to

21   talk about the same info hash, the same form.

22         We asked for pieces of data.  Now, you notice in the

23   extended handshake it never told us 226, did it?  It didn't say

24   anything about 226 pieces or even the file name of this file.

25   It's because both ends of the communication has this instruction

71

1    file.  It's required.  Without a torrent file, you can't

2    download on the BitTorrent network.  You can't just, you know,

3    wander around on someone's computer and say I think I want to

4    download that.  It just doesn't work that way.

11:32    5        It only works because we have the same instructions

6    file.  And also included --

7        So, well, let me back up.  So for the -- for the

8    sharing computer to say I have piece zero through piece 225,

9    which is 226 pieces, tells me right away he's got the torrent,

11:32    10    he has to have the torrent, because I have my copy and sure

11    enough, there's 226 pieces.  Either that or it was a really good

12    guess.

13        But now I named the file like the instructions says,

14    but I've downloaded those 226 pieces.  And where I'm going is,

11:33    15    on page 11 where that highlighting [Indiscernible], that's a

16    hashing that happens on every piece of data shared.  And it

17    comes up with that fingerprint, digital fingerprint as the

18    defense expert described.  It's actually a SHA-1 hash.  Secure

19    hashing algorithm version 1 hash is what BitTorrent uses.

11:33    20        And it calculates the hash value, the signature for

21    all 226 pieces.  And so now what happens is, we are going to

22    compare those hash values and make sure it matches what is in

23    the instruction file of the torrent.

24        We had data set, we calculated the fingerprint, we

11:35    25    look inside the torrent and it matches.  I got the right piece

72

1    of data.  It has to be the right piece of data.

2            So for it to not -- for the computer that connected to

3    us offering to share this torrent file to have guessed that it's

4    226 pieces and responded to our 226 requests for data, have that

11:36  5    computer give us that data and then match 226 SHA-1 hash values

6    is inconceivable.  The computer had to be in possession of that

7    file and the instruction file, the torrent file, for what I

8    described to have just happened.  It's an impossibility.  The

9    computer had to have had it.

11:36  10   Q.  And to be clear, that computer came to you.  So Mr. Owens

11   came to you.

12   A.  Correct.  And when you say "you," you mean the

13   investigator --

14   Q.  I mean the investigator, I'm sorry.

11:37  15   A.  But, yes, the investigator running our software -- just

16   because we searched for the torrent, like any other BitTorrent

17   program searches for download candidates, that was enough to

18   make us associated with the torrent that suspects were any

19   computer on the BitTorrent network comes to law enforcement's

11:37  20   version just the same way they would go to any other BitTorrent

21   program [Indiscernible]:  Bitcom, uTorrent, Sherazel (phonetic),

22   there's a ton of them out there.

23   Q.  And that was Exhibit 2.  Exhibit 3 we don't really probably

24   need you to walk through, but why are there two exhibits?  This

11:38  25   one reflects a date of May 22nd.

73

1    A.   Yes.   It was -- the Torrential Downpour Receptor is

2    configured by the end-user and you can specify what IPs you'd

3    like to investigate.

4         For instance, if I was a law enforcement officer at a

5    university and I knew all of the University's IP addresses, I

6    could say just -- I want to investigate any of these IPs.

7         And with Torrential Downpour Receptor, if any computer

8    having that IP address comes to me offering to sell me drugs in

9    my analogy, or give me child pornography, then I would accept

10   that connection.   I don't care about people in Russia or Spain

11   or France coming to my computer, I care about people in my

12   jurisdiction.

13        Or, the other possibility in the configuration, is I

14   specify by geographic region.   And I think the Court's already

15   heard some of that through the defense expert.   But it's

16   publicly available.   You can go to lots of places on the

17   internet and you punch in an IP address and it will approximate

18   what city and state that that IP is being used in.   And that's

19   just an effort for law enforcement to try to do investigations

20   in their primary jurisdiction and not poaching in someone

21   else's, so to speak.

22   Q.   And so you reviewed the defense expert's affidavit.

23   A.   Yes.

24   Q.   And in there, in paragraph 24 essentially he asked what does

25   it mean to direct investigative focus.   Is that what you're

74

1    saying, this program directs the investigative focus by saying I

2    want to do this in Wisconsin, or I want to do it in northeast

3    Wisconsin, or this particular series of IP addresses?

4    A.   Yes.  It's user configurable.  And it does run -- I

10:57   5    configure it, I launch it, and it's set to investigate people in

6    Wisconsin.  And it's ignoring all the other connection attempts

7    to us.

8         If I have a connection attempt from an IP address and

9    it approximates the location as being in Spain, I just refuse

10:58   10   that connection.  I'm only accepting connections from the

11   Wisconsin area, if that's how I configured it.  And that's how

12   you direct your investigative focus to a particular region, by

13   their IP addresses, or straight up with their IP address if I

14   knew that range off the [Indiscernible].

11:01   15   Q.   And are those the settings that the investigator would be

16   able to essentially input?

17   A.   That, a license, their name.  Things of that nature.  But

18   there is no setting that would enable them to -- enable a

19   feature that would be harmful or would make the software not

11:02   20   work properly.

21   Q.   Or I want to go after this particular person or just white

22   males in a certain area, those aren't variables that this

23   program allows?

24   A.   No, it's geographic region or IP address.  And then you can

11:03   25   further restrict it.  Although I'm sort of the gatekeeper as it

75

1    relates to what torrents do the systems seek out on the network.

2           I can't define what's illegal in every state in the

3    U.S., let alone every country in the world. I include torrents

4    to be investigated that presumably would have some violation

11:03    5    somewhere. It relates to child exploitation.

6           For instance, I could include pictures and movies of

7    17-year-olds engaged in sex, which is child pornography

8    federally and child pornography in Pennsylvania, where I'm from;

9    but in Connecticut, it's 16 or under.

11:04    10           So the onus is on the investigator to look at what's

11    downloaded and determine, yes, this violates our statute,

12    [Indiscernible]. But we don't just sit there and sniff and

13    listen to every piece of BitTorrent communication and try to

14    discern as the defense expert --

11:05    15           And, you know, obviously he hasn't seen the software,

16    but we aren't sitting there sniffing on the network or listening

17    and trying to discern this is child pornography and this is not.

18    No. We have the torrent. We're like every other BitTorrent

19    client. We reach out to the index, the matchmaker as I

11:05    20    described it earlier, and they provide us with IPs. That's it.

21           There's no listening for movie files, for anything

22    else; it's just the predesignated torrents in the system. We're

23    very refined. We're not searching for everything, we're looking

24    for a very specific subset of data.

11:06    25    Q. And to be clear, in this particular case Mr. Owens came to

76

1    law enforcement.

2    A.   Correct.  But let me just say that if he had come to law

3    enforcement and it wasn't one of the torrents we had chosen to

4    investigate, it would have ended there as well.  Because we're

11:06    5    not going to talk to a person about it.

6         The other configuration I was leading towards -- and,

7    sorry, that was a little long-winded -- is that the end-user, if

8    they download material and they determine this is not violating

9    my statute in Connecticut, because it has to be under 16, they

11:07    10    have a mechanism to exclude those in future investigations.  So

11    they can further refine it even more than the work that I've

12    done trying to identify the torrents leading to be investigated

13    by law enforcement.

14    Q.   Okay.  You had the opportunity to view the imaging of

11:08    15    Mr. Owens's computer I believe yesterday in my office, correct?

16    A.   Yes.

17    Q.   Okay.  And I'll ask you what I asked the defense expert, did

18    you find any artifacts or evidence that this particular file had

19    been on Mr. Owens' computer?

11:08    20    A.   Yes.  The torrent which points to a file, yes, that both the

21    torrent and the file was on the system in -- excuse me -- in

22    three different areas.

23    Q.   Okay.  And did you print off basically information that

24    would reflect that that we can show to the Court and provide to

11:09    25    counsel?

77

1    A.  Yes, I did.

2           MR. HUMBLE:  May I approach, Your Honor?

3           THE COURT:  You may, uh-huh.

4    BY MR. HUMBLE:

11:10  5    Q.  I've handed you what have been marked Exhibits 4, 5 and 6.

6    Could you just identify those and tell the Court what they are?

7    A.  Yes.  These are just one portion of the forensic analysis.

8           4 relates to installed programs.

9           5 relates to torrent files.

11:11  10          6 relates to MRUs, or most recently used entries, from

11   the registry.

12   Q.  Okay.  And did you create these?

13   A.  I created this printout, but the forensic -- it was part of

14   the forensic [Indiscernible].

11:11  15   Q.  Sorry, that was imprecise.  You created the images.

16   A.  Yes.

17   Q.  And that captures what you're trying to show here?

18   A.  Yes.

19   Q.  Okay.  I'm going to switch those out, those duplicates, so

11:12  20   that the Court can follow along.

21          Now, I guess start with the first one which I believe

22   is No. 4?

23   A.  Correct.  So --

24   Q.  Sorry.  Could you just explain the significance of why

11:12  25   that's highlighted and what that reflects?

78

1    A.   Yes.   But before I get there, I just want to go back to this

2    log file where the computer that connected to the law

3    enforcement reported what software they were running.   And they

4    reported it as being BitComet Version 1.50, which was

11:13    5    highlighted in yellow in those two exhibits we just went

6    through.

7         So the first thing I would look at would be to see if

8    there is a BitTorrent -- BitComet program installed, and sure

9    enough, BitComet Version 1.50 was installed.   And

11:13    10    coincidentally, or not coincidentally, it was installed on May

11    20th at 9:07 -- I don't have my glasses on, I believe that's

12    right -- p.m.

13         So that's the date, the day before the investigation

14    happened.   So the user of this computer installed BitComet

11:14    15    Version 1.50 the day before the investigation happened and was

16    memorialized in these logs.   So that's the first -- that would

17    be Exhibit 4.

18         MR. DONOVAN:   Your Honor, if I may, I would like to

19    interpose an objection.   I think this is getting a little far

11:14    20    afield of the relevance of this hearing which is whether or not

21    we should have access to the program.

22         It sounds to me like he's trying to establish guilt

23    based on he had the program on this date, it was installed on a

24    certain date, then I guess there was, you know, torrents

11:15    25    downloaded.

79

1    It just seems like this is kind of far afield of where

2    we should be for today.

3        MR. HUMBLE:  Except, Your Honor, that the defense

4    expert places great significance on the fact that he did not

11:16  5    find that particular file on the defendant's computer or in

6    multimedia.  So I think it is certainly relevant that there was

7    strong evidence, which he also testified he did not find

8    necessarily, to show that this was there both before and after

9    law enforcement had any interaction with Mr. Owens's computer.

11:16  10        THE COURT:  Overruled.  And I assume we'll get to the

11    law enforcement privilege later.  But this is kind of the

12    preliminary steps of how it works, as I understand it.  And

13    it's -- I see this as testimony intended to show that the

14    defense is not in need of the software or the computer -- the

11:16  15    other materials sought.  Now, that's arguable, I agree, and

16    certainly you'll be able to cross-examine and argue on that.

17    But at this point I think this testimony is relevant, so

18    overruled.

19    BY MR. HUMBLE:

11:17  20    Q.  Okay.  So, now, essentially he -- if this reflects that

21    [Indiscernible] the tool that was used to knock on law

22    enforcement's computer essentially and say I'm gonna give you

23    this, that's reflected on No. 4?

24    A.  Correct.  Because the file wasn't found, the next thing I

11:17  25    want to know as a forensic expert, okay, if it isn't there

1    today, deletion being a common thing we all do, let's show

2    whether or not it was there during the investigation, which is

3    what this was meant to do.  So the software reported to law

4    enforcement was installed the day before the investigation took

11:18    5    place.  That's the relevance of that exhibit.

6    Q.  And how about Exhibit 5, what's the relevance of --

7    A.  5 is the torrent file named by its info hash.  So if you

8    looked at the detailed log with the highlights that we went

9    through, remembering the first step is to agree that we're

11:18    10    talking about the same torrent file, that's step number 1.

11    Because if we can't agree that it's the same torrent, I'm done

12    talking to you.

13         If you look at the entry on Exhibit 5, the longest

14    cell, it starts "Partition 4 Microsoft NTFS."  But if you look

11:20    15    at the next row down all the way to the end, you see a string of

16    numbers and letters, 0833, and then at the end it ends in 3C0, I

17    believe.

18         If you marry that up with the log, that's the exact

19    same info hash.  So there's a date and time affixed to that.

11:21    20    May 20th at 9:29.  So we're talking 22 minutes after he

21    installed BitComet -- he or she, the user of the computer --

22    20-some minutes later the torrent was downloaded and loaded into

23    BitComet.  Why do I know that?  Because the path of where that

24    torrent was found would only get there if you loaded the torrent

11:22    25    into the BitTorrent program.  Otherwise it would just be sitting

81

1    in my downloads directory or on my desktop or someplace I chose

2    to save it.  That's a hidden directory for applications to store

3    data they're using.  So I know he downloaded the torrent and

4    loaded it into BitComet for it to be there.

11:22    5    Q.  And what is the --

6    A.  And that's the day before the investigation, to put it in

7    perspective, May 20th at 9:29 p.m.

8    Q.  Okay.  And the next exhibit, what is the significance of

9    that?

11:22    10    A.  Well, this is most recently used.  And when you touch files

11    and you access files, it will keep a record of that.  And on May

12    22nd, a file with the exact same file name as the one sent from

13    the suspect computer to the law enforcement computer, is there.

14    And that's dated May 22nd at 1:38 a.m.

11:23    15         So the second investigation occurred on May 22nd at

16    3 a.m.  So it's just an hours apart.  It's still there so it's

17    being shared all the way from the 20th, when he started

18    downloading it, through the 22nd when the second undercover

19    session happened.

11:23    20         And I also note that in the exhibit where the torrent

21    was found, this -- there was more than one instance of him

22    having that torrent.  There was one that dated all the way back

23    to January of 2016.  And so what we are seeing more and more --

24    because I still do investigations beyond the development aspect

11:24    25    of my position -- more and more with the speed of the internet

1    and the efficiency of BitTorrent, not everyone keeps every file

2    they download.  They download it, they look at it, and at some

3    point in time after that they delete it because it's so easy to

4    get it again.

5    And there's -- there's a reference to that same

6    torrent file all the way back to January of 2016.  So that makes

7    me fall on the side of the fence that these files were getting

8    deleted as opposed to it was never there.  It was clearly there.

9    That's what these forensic artifacts show.

10   Q.  And correct me if I'm wrong, the log that we went through

11   previously, that's what law enforcement has -- receives,

12   correct?

13   A.  Right.  This is the memorialization of the events that took

14   place during the investigation made by Torrential Downpour

15   Receptor.

16   Q.  And 4, 5, 6 were taken from the image -- the imaging of the

17   defendant's computer.

18   A.  Yes, that's correct.  That's a seized device.

19   Q.  So these aren't married -- these are two opposite ends

20   essentially matching up.

21   A.  Correct.  Everything's lining up.

22   And I could have stopped just by reading this log.

23   There is no way that a computer at that IP address didn't

24   possess that data, to be able to give me 226 pieces that match

25   the right hash file.  The computer had to be in possession of

1    that data to send it, and this just further confirms it.

2    Q.   Okay.  So let's get to law enforcement privilege then.

3         What's the harm in allowing testing to occur with

4    regard to Torrential Downpour Receptor?

11:27   5    A.   Well, it has access.  In order to run it you have to have a

6    license, first of all.  That license is controlled by the system

7    I'm the administrator of.

8         And when you have a license to the software, it's

9    designed to download child pornography.  And so you put in a

11:29   10   license and you specify an IP address or geographic region,

11   child pornography will be downloaded, because people will arrive

12   to our computer and offer to share child pornography with us.

13   So it exposes each and every torrent file we're investigating.

14        Again, to know the info hash of these torrents could

11:29   15   be harmful to law enforcement because if that gets out --

16   although, you know, people can promise never to release it, you

17   can't un-ring the bell.  Once it's out it's done.  We have to

18   start from scratch.

19        It's taken eight years to amass what we have here

11:29   20   today.  At least eight.  I can't remember the exact days when we

21   started, but it was at least eight years to get where we are

22   today.

23        It exposes the files we investigate and their hash

24   [Indiscernible].

11:30   25        It exposes law enforcement contact information of

84

1    investigators who are investigating individual IP addresses.

2    These are active investigation.

3            It exposes the IP address -- other IP addresses

4    associated with the torrents that we investigate.  So, in other

11:30  5    words, these have yet to be investigated.  There are just so

6    many people on BitTorrent sharing child pornography, we cannot

7    get to them all.  I've trained personally hundreds, maybe

8    upwards towards a thousand investigators, and we can't come

9    close to getting all the people sharing child pornography on the

11:31  10   BitTorrent file sharing network.  And I'm not even talking about

11   all the other areas that we can investigate.

12           So -- and finally, I mean, aspects of the system,

13   you're basically dropping a civilian in the mix of a raid

14   briefing.  These are -- the system is designed to connect law

11:38  15   enforcement officers that have similar investigations based on

16   their IP addresses, they're in some stage of investigation, the

17   system alerts them of that, and you're dropping a civilian in

18   the middle of a raid briefing.  If you're taking something

19   technology and trying to relate it to something real world, it

11:39  20   would be an equivalent.

21   Q.  Were you saying raid, r-a-i-d briefing?

22   A.  Raid like a search warrant.

23   Q.  Okay.

24   A.  Is what I was referring to.

11:39  25   Q.  Okay.  So, let me ask you, with regard -- in your opinion,

85

1    as someone who helped develop this program and obviously has a

2    lot of familiarity with it, is Torrential Downpour Receptor so

3    different from other BitTorrent programs that there is a strong

4    need for the defense to have this before they could

5    cross-examine somebody on the operations of this particular

6    BitTorrent?

7    A.   The only point of confusion that I could see the defense

8    expert having, which he now has the answer to, was why a

9    computer would connect to us.  He gave a definition of seeding.

10   And I don't know that he had a full understanding of what

11   seeding actually was.

12            But now with that question answered, this is -- this

13   is BitTorrent talk.  This is not Torrential Downpour Receptor

14   talk.  I mean, anyone should be able to look at this and see

15   that data was sent and it matches the corresponding hash

16   [Indiscernible].  The defense expert has the ability to look at

17   the torrent which is part of discovery, open it up and see all

18   of the hash values of all those 226 pieces, see that they were

19   verified, could even take the original file and hash those

20   individual segments to make sure that they do, in fact, belong

21   to that file, none of which requires our software.

22            This is -- this is a law enforcement BitTorrent piece

23   of software that, yes, employs the ability to download from a

24   single IP address as opposed to from multiples.  Well, that's

25   law enforcement being more restrictive on itself.

1          I could get it really fast, but I'm willing to wait.
2   But it's not something unique to law enforcement software.  A
3   download from a single sharing IP happen all the time.
4          So I don't believe that there is a need to confirm it
11:45  5   when we've detailed it as specifically as we have.  This is all
6   information, as the defense expert said, that any BitTorrent
7   client would know.  But whether or not it chooses to display it
8   to the user, and certainly probably wouldn't memorialize it to a
9   log file like this, but it is to aid the prosecution, but it's
11:46  10  also letting the defense expert know exactly what happened at
11  what moment in time.
12         And he can confirm these things through the forensic
13  analysis, as I did.  I spent 10 or 15 minutes and found these
14  three items.  There's probably much more on there that I didn't
11:46  15  look at, and to have the torrent file and the data, that should
16  be sufficient.
17  Q.  In your expert opinion, if there had been a bug or a glitch
18  in the software, would that be reflected in the things that
19  you've reviewed prior to your testimony here today?
11:47  20  A.  Yes.  I mean, I would get the bug reports.  I would know if
21  there was a bug report.  If people are continually downloading
22  files and they didn't come from the sharing computer, I would
23  know to seek that out.
24         But it's a very simple process.  As the defense expert
11:47  25  said, the IP addresses have a source and destination IP right in

1    every packet of data.  It's not hard to discern where it came

2    from.  And we just memorialize that in this document.

3         And, again, that IP address came to us.  Just like if

4    you visit a web page, that web server knows your IP address

11:48  5    immediately.  Well, the suspect computer came to us.  We

6    documented the IP address, we allowed the communication to

7    happen, and then we received the data they wanted to share with

8    us.

9    Q.  Would you -- based on your knowledge of Torrential Downpour

11:48  10   Receptor, would you describe it as bug-ridden or buggy as I

11   guess software people say?

12   A.  No.  Early on in its early stages of development we had the

13   source code looked at, and there was one issue -- and this is

14   eight years ago -- where we weren't accounting for long file

11:49  15   names that exceeded 260 -- or the path and file name to exceed

16   260 characters, that was fixed, and that was the end of the bugs

17   as it relates to downloading.

18        BitTorrent is a very, very light-weight small

19   protocol.  A BitTorrent program like BitTorrent or uTorrent are

11:50  20   like a couple megabytes.  It's the size of a single picture.

21   It's not a ton of code that could be bug-ridden like the defense

22   expert's example of an operating system or Microsoft Word that

23   are millions of lines of codes.  We're talking about 2 megabytes

24   of programming.

11:50  25        So, but that was fixed eight or more years ago, the

88

1    long file name issue, and all that would have done was shut the

2    program down.  It wouldn't have collected erroneous information.

3              And the fact that BitTorrent relies on SHA-1 hashing,

4    which is extremely accurate, you're not going to get the false

11:52   5    positives because we're confirming the data through hashing, the

6    same thing forensic examiners use to confirm I'm working from an

7    exact duplicate of the hard drive seized.  We rely on it day in

8    and day out.  Well, BitTorrent does as well.  And through

9    hashing, short of SHA-1 hashing failing, which is very, very

11:52   10   accurate, you're not going to get a [Indiscernible] false

11   positive.

12             MR. HUMBLE:  Judge, I don't have any further

13   questions.

14             THE COURT:  Mr. Donovan?

11:53   15             MR. HUMBLE:  Could I just ask that those exhibits be

16   received, Your Honor?

17             THE COURT:  1 through 6 received.

18             I take it there's no objection.

19             MR. DONOVAN:  Well, Your Honor, I mean, we didn't see

11:53   20   Exhibits 4, 5 and 6 before today, but, I mean, no objection as

21   far as --

22             THE COURT:  I don't think they existed before today.

23   It sounds like they were run off today.  Is that right, Mr. --

24             MR. HUMBLE:  Was it this morning or last night?  Last

11:54   25   night perhaps.

1    THE WITNESS:  To be clear, this is the forensic report

2    of the forensic examiner.  This is the material that was --

3    MR. HUMBLE:  Yeah, it's been provided, just not the

4    exhibit --

11:54  5    THE COURT:  Okay.

6    MR. DONOVAN:  Your Honor, we don't deny that the

7    forensic material was provided, but, I mean, it's large.  It's

8    very voluminous.  And we did not see these exact references

9    until today.

11:54  10    THE COURT:  Yeah.  But you had access to the hard

11    drive or the computer --

12    MR. DONOVAN:  Correct, yes.

13    THE COURT:  -- evidence from which this was taken.

14    I'll overrule the objection and 1 through 6 are

11:55  15    received.

16    (Exhibits 1-6 received in evidence.)

17    MR. DONOVAN:  Thank you.

18    CROSS-EXAMINATION

19    BY MR. DONOVAN:

11:57  20    Q.  Good afternoon.  Getting towards the evening here shortly.

21    Okay.  So you have testified that you were part of the

22    original development for all of these types of programs,

23    correct?

24    A.  Yes.

11:57  25    Q.  And it's been kind of an evolution from probably -- I don't

1    know if Gnutella was maybe the first iteration all the way up

2    through now BitTorrent.  Right?

3    A.  There are many file-sharing networks that we have

4    investigative tools for.

11:59  5    Q.  Can you I guess more precisely describe your role?  Because

6    you said you didn't do any of the actual programming, correct?

7    A.  I didn't write Torrential Downpour Receptor, the program

8    being used.  I did programming on the back end and testing of

9    the software.  But with the other tools there are programming

11:59  10   elements that I did participate in, it's just not with

11   Torrential Downpour Receptor.  The physical program sitting on

12   the investigator's computer, how it logged search results and

13   things like that I was involved.

14   Q.  Okay.  How long did the development take of Torrential

11:59  15   Downpour?

16   A.  From the point in time where we first talked about it at the

17   University of Massachusetts to releasing the first version, it

18   was well over a year.  Maybe more.

19   Q.  And maybe this is a good time, can you explain the

12:00  20   difference between Torrential Downpour and Torrential Downpour

21   Receptor?

22   A.  Torrential Downpour wasn't used in this case and it doesn't

23   sit and wait for suspect computers to arrive to our computer.

24   It's the complete opposite of that.

12:00  25           So Receptor sits and listens passively for people

1    coming and knocking on our door asking to share torrents that we

2    know that involve child exploitative material.

3            Torrential Downpour makes outbound connections trying

4    to connect to somebody that may or may not be sharing child

12:01    5    pornography.

6            That's the big difference.  We sit passively and wait

7    for the suspect to come to us.

8    Q.  Is the only way you know which one was used in this case is

9    from reviewing the logs?  Or did you talk directly to the law

12:01    10    enforcement officers who ran this?

11    A.  Well, the log certainly tells us -- that's the whole purpose

12    of putting on the first line the software that's used.  But

13    beyond that, through networking I can tell that.

14            In the extended handshake he tells us what his listing

12:02    15    port is.  So if I were to connect to him, I would connect into

16    that port.  I know we're getting kind of technical.  But you can

17    see at the top, he connected to us because it's an outbound

18    port.  There's a specific range of ports.  Of the 65,000

19    ports -- there's more than 65,000 ports available to use --

12:02    20    there's a set of ports set aside just for making outbound

21    connections.

22            So it's proof that the suspect computer connected to

23    us.  The networking ports alone tell you that.  And the software

24    that we indicate we were using at the top of the log indicate

12:03    25    that.  That's the only functionality it has, is to receive an

92

1  inbound connection which triggers an investigation.

2  Q.  But, again, you would agree that the logs are a subset of

3  the program, correct?

4  A.  The --

12:03  5  Q.  They're generated by the program.

6  A.  They're generated by the program, I agree with that.

7  Q.  And so the information that comes from the program dictates

8  what's on the logs.

9  A.  Correct.

12:03  10  Q.  In other words, the logs aren't an independent check or

11  verification of anything, it's a subset of the program that

12  we're talking about.

13  A.  Correct.  The computer comes to us, we see the IP address,

14  we memorialize it in the log.  Correct.  Which is Windows,

12:04  15  actually.

16  Q.  What language is Torrential Downpour Receptor written in?

17  A.  C#.

18  Q.  Okay.  And so obviously this involved, you know, computer

19  scientists and software developers and other people besides

12:06  20  yourself to put it together, correct?

21  A.  Me and one guy, Brian Lang.

22  Q.  Okay.  Oh, just the two of you.

23  A.  Yes.  And it's not -- it was written by the ground up from

24  the university.  It was not a modified version of an existing

12:07  25  program.  So that was incorrect information the Court had heard.

93

1    It was written by the University of Massachusetts Amherst.  And

2    the team of developers beyond the initial research is me and

3    that one individual.

4    Q.  Okay.  Now, you've reviewed the pleadings in this case,

12:08    5    right?

6    A.  Yes.  Well, I've read the defense expert's report/affidavit.

7    Q.  Did you read any of the motions filed by either me or the

8    government?

9    A.  I did not.  They were already filed and done before I even

12:08    10    had communicated with the office.  I don't believe I -- I did

11    have a copy of the police officers' report.  I never had a copy

12    of the search warrant.  And then obviously I have the two

13    detailed logs.

14    Q.  So, sir, are you aware that the government has said that

12:08    15    basically the investigator in this case accessed BitTorrent like

16    a normal or average user of the program?  I'm talking about the

17    normal BitTorrent program, not the law enforcement program.

18    A.  Can you repeat that?  I don't want to --

19    Q.  Are you aware that the government's characterized law

12:09    20    enforcement's use of BitTorrent here as a normal or average

21    user?

22    A.  I am now, I wasn't before.  But I don't feel that that's

23    inaccurate.

24    Q.  You don't feel that's inaccurate.

12:09    25    A.  No, we follow the protocol.  And just like any other program

94

1  can receive an inbound connection and download any or all of

2  that data, we did the exact same thing except we memorialize the

3  data and we don't share.

4  Q.  Well, there's -- I mean, there's a lot of other things that

5  the program does the public version doesn't, right?

6  A.  (No response.)

7  Q.  And I can give examples.

8  A.  Okay.

9  Q.  Would you agree that, again, it does single source

10  downloads?

11  A.  Correct.  The general public does that as well.

12  Q.  And I understand you testified that that could also happen

13  in the public if there was only one computer sharing this one

14  file that could be a single source, but your program doesn't

15  even when there's multiple sources available which would be

16  contrary to the normal protocol, right?

17  A.  Our program I'm sure it happens every time, but it happens

18  naturally every day on the internet.

19  Q.  But yours insures it only happens on single source

20  downloads.

21  A.  Right.

22  Q.  Right?  It wouldn't do any good to get multi-source

23  downloads and then try to figure out who to attribute this to,

24  right?

25  A.  That would be counterproductive.  It would add a burden to

1    law enforcement.

2    Q.  And your program -- and I think you testified earlier that

3    it doesn't fake file share, it just says it has no pieces to

4    share, right?

5    A.  Because we have no pieces to share we appropriately say we

6    have no pieces to share.

7             Because the computer -- since we're employing a single

8    source download, every piece of data we have received came from

9    the computer that connected to us.  So there is no need for us

10   to ever share any data back because everything we have came from

11   the sharing computer.

12   Q.  Well, I understand, too, you don't want to share contraband,

13   correct?

14   A.  Correct.

15   Q.  Okay.  How do you then -- so the program does something to

16   stay on the BitTorrent network and not get kicked off, right?

17   A.  That doesn't exist.  And I don't -- I'm not sure what the

18   defense expert was talking about.

19   Q.  Well, have you heard the term "throttling" before?

20   A.  Yes, you can throttle.  That's not being kicked off the

21   network.

22   Q.  Oh.

23   A.  So, in other words, there are incentives.  If you share, if

24   you employ that tit-for-tat exchange, so I'm giving pieces as

25   I'm getting pieces, you're -- the allocated bandwidth you're

01:09
01:09
01:10
01:10
01:11

96

1    given is increased.  So I might get that file a little quicker.

2              But, to not share, I'm still able to download and I'm

3    not kicked off the network and I'm not fake file sharing.

4    Q.  Okay.  I'm sorry, I don't mean to be imprecise.  I didn't

01:11  5    mean to say kicked off the network.  But you could get throttled

6    if you're not sharing, right?

7    A.  You could receive your downloads slower than other

8    BitTorrent clients.

9    Q.  But here you testified that based on the logs these

01:12  10    downloads actually occurred pretty quickly.

11    A.  Correct.  Because the client didn't need any pieces for us.

12    The tit-for-tat exchange was gone.  That, on top of the fact it

13    was an AT&T U-verse connection, which has a large amount of

14    upload bandwidth which is the one exception.  AT&T U-verse and

01:12  15    Verizon Fios have huge upstream bandwidths.  So what the defense

16    expert was describing really doesn't apply because the

17    connections are so fast.  But it's only a 15-megabyte movie, so

18    I expect it to happen fairly quickly with the speed of the

19    internet today.

01:13  20    Q.  So just to be clear, is your testimony that the program does

21    not do anything to stay on the network that an average user

22    couldn't do?  To avoid being throttled or --

23    A.  I don't even understand what you mean by on the network.

24    Because you're on the network every time you load a torrent file

01:14  25    into your program.  You don't get kicked off.  A user can choose

1    to share the data with you slower.  And, yes, that is part of

2    the incentive scheme for this give-to-get scenario on

3    BitTorrent.  But it doesn't preclude you from getting everything

4    without sharing one single bit of data, which happens naturally

01:14   5    every day on the network.

6    Q.  So does Torrential Downpour do anything to avoid throttling?

7    I shouldn't say kicked off.  Avoid throttling for not sharing.

8    A.  No.  We properly say we have nothing to share at the

9    beginning of the session.  And then if ever we're asked again,

01:14  10    if we handshake again, which happens sometimes, we would report

11    what pieces we did have to share.

12              Again, the sharing client gave us every piece we

13    possess.  There is no need for him to ever request that back

14    from us.  So this whole tit-for-tat exchange and the throttling,

01:15  15    as you put it, of the bandwidth doesn't really come into play in

16    this case specifically because they were seeding.  They had all

17    of the content.  There is no need to throttle data.  Its purpose

18    in life when it's seeding is sharing the data proactively out to

19    the network to keep that data alive on the BitTorrent network.

01:15  20    So throttling really isn't in play when there's a seed.

21    Q.  Is it ever in play, though?  I mean, it's not in play in

22    this case, but can it ever be in play that you get throttled?

23    A.  Oh, absolutely.  Again, if I never share a piece of data,

24    which we don't, I will never benefit from added bandwidth from

01:16  25    the sharing client.

98

1        Additionally, clients at times, depending on --

2    there's so many variables to go into, but depending on how

3    popular the torrent is, they could actually share with me for a

4    period of time and then disconnect from me.  And then later, as

01:17    5    any BitTorrent client would, you can reconnect and ask for

6    additional pieces.  Again, I'm in the same situation.

7    Q.  So I'm not trying to belabor this, but, again, not in this

8    case, but does Torrential Downpour Receptor ever do anything to

9    not get throttled in general to be able to keep up fast --

01:17    10    A.  No.

11    Q.  -- and do what it wants to do?

12    A.  To the contrary.  We get throttled is what I'm trying to

13    say.  We didn't here because --

14    Q.  Okay.

01:17    15    A.  -- he was seeding.  But there is no secret mechanism to keep

16    us getting data faster than we deserve to get it.  It doesn't

17    exist.  And I wasn't trying to avoid the answer --

18    Q.  Okay.  It's fine.  I apologize.  I probably wasn't being

19    precise enough.

01:18    20        Torrential Downpour Receptor again generates these

21    specialized data logs that you've talked about which the normal

22    program doesn't do, correct?

23    A.  Correct.

24    Q.  Okay.

01:18    25    A.  It's information known by the programs, but there would be

99

1    no purpose for BitComet to write out a log like this.

2    Q.  And it conducts searches against the hash library, you've

3    talked about, right?

4    A.  (No response.)

01:19    5    Q.  Again -- in other words, you have a set of hash values that

6    you are looking for torrents that report having an association

7    with them, correct?

8    A.  Correct.  We're searching for a torrent exactly like any

9    other program out there.  As soon as a torrent gets loaded into

01:19    10    BitComet, which is the program in question here, it actually

11    searches for download candidates.

12        And that's what we do.  We physically load a torrent

13    into Torrential Downpour Receptor, and then it searches the

14    network for download candidates.  It's exactly the same.

01:20    15    Q.  Now, to be clear -- to be clear, when you say "we" it's

16    actually you.  You maintain control exclusively of the database,

17    or library, whatever you want to call it, of all these hash

18    values you're looking for, right?

19    A.  What torrents we search for I'm in control over.  What is

01:20    20    being searched for by the investigator is an actual torrent file

21    being loaded into Torrential Downpour Receptor like any other

22    program.  We're just excluding the commercial movies and the

23    commercial music and the illegal, you know, copyrighted programs

24    that are traded on BitTorrent and we're only focusing on child

01:21    25    exploitation material.

1  Q.  Again, that you decide on, correct?

2  A.  I decide on what is to be searched for.  The investigator

3  decides on what to use as probable cause for a charge.

4  Q.  Okay.

01:21  5  A.  And they make suggestions.  They will submit torrents to me

6  to be evaluated to be included into our system.

7  Q.  Can you describe a little bit about how the program is set

8  up by someone who's got a license and is trained to do this?

9  A.  Sure.  It has an installer file just like any other program.

01:21  10  You double-click an installer file.  It will ask you some

11  questions.  Some questions already have answers to them.  But it

12  will ask you to input your name.  There are options to put in

13  your email address.  But you have to have a license number to

14  run it or else it won't function.

01:22  15      So we control who has a license.  So if the software

16  gets out there it's nonfunctional without the license, it will

17  do nothing.

18      You will specify with Receptor what geographic region

19  you'd like to investigate.  Or you could express it by the

01:22  20  physical IP address or a range of IP addresses, which is the

21  trigger to the program to decide whether to, as the investigator

22  put I think, direct his investigative focus towards a particular

23  IP or not.  It's based on his settings.  He's told the computer

24  investigate these IPs or just investigate people in Wisconsin as

01:23  25  opposed to anywhere in the world.

101

1         And there are settings regarding how long should we

2    wait for the download to complete.  Because we're not gonna wait

3    forever.  And so we can just stop the investigation after a

4    predetermined period of time.  The default I think is four

01:24    5    hours.

6    Q.  And this program can run automatically, right, after it's

7    set up and configured?

8    A.  Correct.  You're going to configure it and set it up and

9    it's going to search for torrents and receive those inbound

01:24   10    connections automatically.  The logs get written out

11    automatically as well.

12    Q.  So does the investigator typically just check the results

13    like every day, every week, every month?  Like how does that

14    work?

01:24   15    A.  Well, I can't speak for every investigator, but on every

16    shift of my work I check my logs.

17    Q.  Okay.  Okay.  So going back to the logs that have been

18    introduced as Exhibits -- I believe 2 and 3, how do those logs,

19    for example, like establish by themselves that Torrential

01:25   20    Downpour Receptor doesn't invade, for example, the shared space

21    of a computer?

22    A.  Well, it basically comes down to -- well, first the suspect

23    computer comes to [Indiscernible].  That's the first piece.

24         The second piece is just to understand BitTorrent, if

01:25   25    you understand the BitTorrent set of rules that have to be

102

1    followed and how it functions, it's -- what you're describing is

2    impossible.

3         I can't -- if I wanted to download -- excuse me, I'm

4    sorry.

01:25   5         If I wanted to download a file from some unshared

6    location on the computer, I can't even do that because both the

7    sharing computer and the investigating computer -- or in another

8    way I could say that as any two BitTorrent programs -- would

9    require that you have the exact same torrent file.

01:26   10        I can't -- there's no function within BitComet, which

11   is what was used on the suspect computer in this case, there is

12   no ability to download anything.  We can only receive what the

13   sharing computer permits us to get.

14   Q.  So is your answer that the program just can't do it and,

01:27   15   therefore, that's why it's not on the logs?  Is that --

16   A.  It's -- yeah.  Not even BitComet.  Any BitTorrent program on

17   this planet require a torrent file on both sides with that

18   really unique identifier.  I have no way to know where these

19   files are on the suspect computer, let alone create a torrent

01:28   20   file, load it into his BitTorrent program, just so that I could

21   then investigate him with our BitTorrent software.  There's just

22   no mechanism.  You'd have to show that there was a flaw in

23   BitComet at Version 1.50 that allowed some crazy intrusion like

24   you're describing, but that doesn't exist.

01:29   25   Q.  Are there any other types of logs generated besides what's

1    been entered as exhibits or is that the comprehensive log?

2    A.   This is the comprehensive log.  There's also a net -- a

3    netstat.  Because for reasons just like this, there's a Windows

4    program that will record TCP connections.

01:29   5         And earlier as I was describing how the suspect

6    computer connected to the law enforcement computer, it was

7    through something called a TCP connection.  And Windows has a

8    utility that will track all of the TCP connections between my

9    computer and other computers.  So we run this netstat program,

01:30   10   this windows program that has nothing to do with us and our

11   development, to confirm, to give corroborative evidence that,

12   yes, this other program came to the same conclusion as us that

13   there was an active TCP connection between us and the suspect

14   computer.

01:31   15        So there's the netstat log.  There's a summary log

16   which is just less verbose than the detailed log.  There is the

17   torrent info.txt file which gives you all of the information

18   inside of the torrent that is used to calculate that unique

19   identifier, that info hash I spoke of.

01:32   20        There's two XML files that contain data and I don't

21   remember them off -- the names off the top of my head.  Those

22   XML files are just data that help us evaluate the case more

23   quickly.

24        It's the same data that you're finding in the detailed

01:32   25   log in other areas.  We have a program that helps us parse

1    through that and realize information.  So that's what those XML

2    files are for.  And then you have the actual downloaded material

3    which is in a download directory.

4              So that's the output of the software, all those items.

01:33  5    Q.  Are there any other either libraries or software packages

6    that the program relies upon or uses?

7    A.  No.  Actually there's no libraries.  Everything was written

8    from the ground up.  There was a point in time I think he was

9    using an open source library, but he ceased using that years

01:34  10   ago.

11   Q.  So is it like -- I mean, I'm not trying to be too basic

12   here, but is it literally like one file, the program?  Like one

13   application file?  Or does it have associated files with it?

14   A.  Yeah.  I mean, you're gonna install a program and it's one

01:34  15   file to start the installation, but it's just not a single file

16   that makes it work.  There's configuration files and such.

17             For instance, when you're inputting the settings on

18   who you want to investigate, that has to be stored somewhere.

19   There's other associated files [Indiscernible].

01:35  20   Q.  Okay.  Is Torrential Downpour Receptor actively maintained?

21   A.  Yes.  It's worked on and maintained by the University, who

22   is the owner of the software.  It still exists.  And, you know,

23   there may be features we want added to it.  That programmer is

24   still available to accommodate law enforcement requests.

01:36  25   Q.  How about like, are there patches done to it occasionally?

105

1     A.   Oh, there's new versions released to implement new features

2     that we want to make law enforcement's job easier in evaluating

3     the case.  There's so many people on BitTorrent sharing child

4     pornography that we want to try to get the most egregious stuff

01:37  5     first.  Those are the changes that are being made in the new

6     release.

7     Q.   Is it your testimony that there's really only been one bug

8     with this program since the time it was developed?

9     A.   That's the only bug that I know of that relates to single

01:37  10    source downloading, and it was reviewed -- it was the long file

11    names, which was handled.

12    Q.   Who found that or who reviewed that?

13    A.   Before the FBI would let the -- their agents use the

14    software, which we had already bought through a grant, and they

01:38  15    did an independent validation of the method in which we do

16    single source downloading to confirm that we don't share, which

17    obviously law enforcement can't become part of the problem, and

18    that it does employ properly as [Indiscernible].

19    Q.   I don't know suppose that FBI validation is publicly

01:39  20    available.

21    A.   No.  I mean, the purpose of them doing it was to permit the

22    agents to use the software we developed.  And now they've

23    abandoned their own programs and just use the whole

24    [Indiscernible] that make --

01:40  25    Q.   But again, that's not something that we can look at, that

1  validation.

2  A.  I don't have it.  I've read it once, and that's why I know

3  that was the bug that was seen and fixed immediately.  And,

4  again, I'm the administrator of the entire system still to this

01:41  5  day.  It's housed by the Pennsylvania State Police in a computer

6  center and I would receive those bug reports.  I don't know of

7  any other bug that would affect [Indiscernible].

8  Q.  So you're the only person that would get reported to if

9  there was a problem?

01:41  10  A.  Me or the developer.  If any other instructor would receive

11  it, it has to come to me eventually, or the programmer.

12  Q.  So how often typically is it updated?

13  A.  The version that's current -- I don't think there was any

14  release in the last six, eight, ten months maybe.  There may be

01:42  15  some years where there were a couple releases.  Because we,

16  again, they're feature enhancements, not changing the method in

17  which we single source download.  But we may want to be able to

18  flag the most egregious torrent as opposed to torrents that have

19  pictures of kids modeling adult lingerie or something like that.

01:42  20  Q.  Well, that would just be more updating the hash database,

21  right?

22  A.  No, that's updating the program and how you look at it.

23  Q.  Okay.

24  A.  How you look at the data.

01:43  25  Q.  What type of network connectivity does it require?

107

1    A.  It uses TCP communication for the file transfers.

2         TCP, Your Honor, is transmission control protocol.

3    And it's, again, that type of internet traffic that I compared

4    to like a phone call.  You dial a number, you say hello, hello.

01:43    5    There's error correction, all kinds of things.

6         Some of the indexing that BitTorrent uses also uses

7    UDP packets, which are connectionless packets.  And that's for

8    once you load the torrent, so that you can get those IPs of

9    people associated with the torrent.  That comes via UDP

01:44   10    depending on which index you're connecting to.  So it uses both

11    TCP and UDP networking.

12    Q.  Do you test to determine whether it's operating correctly

13    from time to time?

14    A.  Yes.  You test it at the conclusion of every class with the

01:44   15    students.  I test it before the release of the software.

16    There's a validation process.

17    Q.  So you've done that testing in the past.  You say you do it

18    every class that you teach?

19    A.  Yeah, at the conclusion of the class we go through a

01:44   20    process.  Because it's automated the end-user in the class,

21    we'll go through a validation process.

22         So, for instance, if we're gonna rely upon a log as

23    the basis to get a subpoena for a subscriber or eventually a

24    search warrant, then that investigator needs to trust that the

01:45   25    logs' dates and times are correct.

108

1      So we have a computer that's sharing content and a

2  computer that is investigating.  And we show both screens.  And

3  as -- as events happened we confirm that the dates and times in

4  the log are correct.  We confirm that the IP address purported

03:11  5  in the log is correct.  Because we're controlling both sides of

6  the communication, so we know the sharing computer's IP and the

7  investigating computer's IP.

8      We verify that it properly weights out the info hash

9  of the torrent in question, and that it dates and timestamps

03:12  10  appropriately throughout that log.

11      And then, finally, it calculates the MD5 and SHA-1

12  hash at the conclusion of the transfer.

13  Q.  So in this training or this validation testing you just

14  described, you're controlling both computers, correct?

03:13  15  A.  Correct.

16  Q.  Are you actually transferring child pornography or is it

17  just a benign file of something else?

18  A.  It's a benign file.

19  Q.  So why couldn't that be done for the defense?

03:13  20  A.  Well, it exposes all those other things to our system.

21      Again, once you have a license to our software, you

22  see active investigations, you see contact information for the

23  investigators, you would learn all of our hash values, all the

24  info hashes of the torrents.  But it is possible to set up a

03:14  25  torrent with data that is not child pornographic, but it takes

109

1  my involvement.

2  Q.  Well, in fact, so you've done that before for the defense

3  counsel, right?

4  A.  Done what?

03:14  5  Q.  A demonstration or a validation testing.

6  A.  I've done demonstrations.  But when I do demonstrations I

7  can just actually -- I can actually just transfer child

8  pornography.  In my test I run the system, I actually download

9  [Indiscernible] log.  I don't have to show them the movie file

03:15  10  that gets downloaded.  But additionally, we have offered a

11  validation test -- although it's in-house, we've offered a

12  validation test I think for [Indiscernible].

13  Q.  So you have offered some access before to defense counsel,

14  right?

03:16  15  A.  Not to the software.  A validation test which is documented.

16       The whole process, like I describe to our students,

17  we'll test the software so they can be comfortable with the

18  dates and times, the logs, what's logged.  There's a whole

19  validation process.  And just like the students would see, both

03:18  20  the sharing computer and the investigating computer, we do that

21  with video screen recording.  So visually you can see that the

22  software is connected to the sharing computer.  The logs are

23  shown.  And so you can verify the dates and times are accurate.

24  And then, finally, there's a packet capture.

03:18  25       As the defense brought out, that can be used to prove

110

1    single source downloading, which is the only thing that I saw

2    other than the questions he had in his report was more of a

3    what-if scenario, what if it was downloaded from someone else.

4        So that's the only thing I really saw in his report

03:19  5    that was any question as to the reliability of our software

6    short of not finding a file, but clearly it was there.

7        So that packet capture is proof of single source

8    downloading as your own expert said.

9    Q.  But you've never let anybody do a packet capture, you never

03:20  10   let anyone have hands on the program.  The most you've ever done

11   is let them just watch your demonstration controlled on both

12   ends from you.

13   A.  Correct.

14   Q.  Or by you.

03:20  15   A.  It's documented in such a way it couldn't be altered.  Hash

16   values of all the elements of the tests are recorded and seen

17   visually and memorialized [Indiscernible].

18   Q.  Has the government asked you to be able to do that here

19   today, you know, in this case?

03:21  20   A.  No, the government never -- again, I got involved in this

21   case I think after the motion -- the pending responses or

22   motions were filed.  It's only been a couple weeks that I've

23   been involved in the case.

24   Q.  All right.  So when you do a single source download from the

03:22  25   IP address that you identify as a target computer, okay?  Do you

111

1    know how long at that point that the source computer had that

2    file?

3    A.  No.  If you had search results, a history recorded, you

4    could have an idea of about how long.  But normal BitTorrent

03:22    5    communication, no, would not tell you that.

6    Q.  And you didn't know -- you wouldn't know where they got it

7    from, where the source computer might have gotten it from in the

8    first place, right?

9    A.  No.  No.  I mean, that's true with file sharing as a

03:23    10    whole --

11    Q.  Okay.

12    A.  -- across the board, yeah.

13    Q.  So it could have been downloaded by that source computer as

14    a single file or it could have been downloaded in a batch.  I

03:23    15    think you testified earlier that you can download, you know,

16    multiple files at one time, right?

17    A.  Yes.  Some torrents describe one file, as it was in this

18    case, or it could be dozens or more.

19    Q.  So it could be a situation where a user of a computer is

03:26    20    downloading dozens of files, a whole batch of files and, you

21    know, maybe one of it or some of it's child pornography, the

22    rest is legal material.

23    A.  That's certainly possible.  That's the whole purpose --

24    that's why we get search warrants and do an interview.

25    Q.  Right.

112

1    A.  Because we'll never know that before the search warrant

2    and -- we're dealing with the internet here.

3    Q.  So I think you testified earlier -- so you say that it

4    doesn't sniff data across the network in total, but you must be

5    doing some sort of narrowing-down or winnowing process that only

6    gets you what you're looking for which means by definition

7    you're excluding other things, right?

8    A.  No.  I have a torrent.  Although I'm the gatekeeper of all

9    the torrents, each investigator has a physical torrent.  They

10   load it into a physical BitTorrent program, Torrential Downpour

11   Receptor.  It searches for download candidates and then it

12   receives search results.

13         Done.  That's it.  But that's every BitTorrent client.

14   That's different than saying like with a wiretap, a phone

15   wiretap, you're listening to all conversations in and out.  With

16   a packet capture, as the defense expert described, that's

17   listening to all the communication on a wire.

18         Here we are searching, issuing a search request to

19   find IPs and receiving results and recording it.  That's it.

20   It's not like we're listening on the internet for any time any

21   BitTorrent communication happens and I can somehow magically

22   discern one from the other.  That's not at all what happens.  We

23   just search and receive results.  That's it.

24         MR. DONOVAN:  Your Honor, if I could have one minute

25   to consult with my expert.

113

1          (Brief pause.)

2          MR. DONOVAN:  Your Honor, I don't have any further

3   questions.

4          THE COURT:  Mr. Humble, anything else?

03:38  5          MR. HUMBLE:  No, Your Honor.

6                        EXAMINATION

7   BY THE COURT:

8   Q.  Mr. Erdely, you said that one of the concerns about allowing

9   an expert to share or look at some of these things is that it

03:38  10  would expose hash values?

11  A.  Correct.  It would expose -- it's taken years to amass the

12  instruction files, those torrent files that law enforcement are

13  seeking out.  If any of that --

14  Q.  Aren't those -- I thought those were publicly available.

03:39  15  A.  They are publicly available.  They're not -- but what the

16  public doesn't know is what areas we, law enforcement, exist in.

17  We're looking for these 500,000, 2,000 torrents.  To put that

18  out there would give them the key to not get caught.  We'd have

19  to start from scratch.

03:39  20  Q.  Okay.  So you don't want them to know what you're looking

21  for.

22  A.  Correct.

23  Q.  The other thing is, now, Exhibits 2 and 3, the logs, are

24  essentially downloads of the exact same video?

03:39  25  A.  Yes, sir.  That computer was online sharing it over two

114

1    days.

2    Q.   Why -- I thought -- you know, if you put out the request,

3    why does it pull in from the same person twice?

4    A.   And actually you can -- there are settings to avoid that.

03:40    5    If you downloaded the whole torrent from somebody --

6    Q.   Yeah.

7    A.    -- in our software you can say don't try to download again.

8    But, I believe your question is more about why would -- why

9    would the same computer come to us to be overly helpful and

03:46    10    share the whole file with us the second time when they had just

11    done it the day before.  Is that summarizing --

12    Q.   Yes.  And your initial log says we don't have any of it.

13    A.   Right.

14    Q.   But by that time, the time the second download happens, you

03:47    15    have it all.

16    A.   Right.  But that's a whole other investigative session.  So,

17    to remember, and we haven't really talked about it in this

18    hearing much, IPs are dynamic.  They change.  I could have one

19    IP address today and another IP address tomorrow.  There is

03:47    20    nothing that is going to enable me to know, even though it's the

21    same IP address, a day later.  I don't know for certain it's the

22    same individual.

23    Q.   Okay.

24    A.   They're dynamic and can change daily or even hourly.

03:48    25    Q.   Now, we just have the logs that came from the IP address of

115

1  the defendant.  In this same investigative session is it likely

2  that this search or this -- not so much a search, but they

3  received -- after inputting this torrent, this hash value --

4  received a number of other hits as well where there were other

03:48  5  individuals now that they followed up on?

6  A.  Yes.  So the software isn't going to just sit there and

7  investigate one person at a time.

8  Q.  Right.

9  A.  There are different programming threads that you could have

03:48  10  multiple investigations going on at any given time.  So, for

11  instance, I could have through my web browser five tabs open

12  with five different web pages.

13  Q.  Uh-huh.

14  A.  But tab 5 doesn't somehow get mixed up with tab 1.  I see

03:49  15  MSN here, I see CNN there.

16       Same concept.  And Windows controls that.  It's not

17  even -- if there was an error in that, you would need to go to

18  Microsoft and say why aren't you controlling your TCP

19  connection.

03:49  20  Q.  Yeah.

21  A.  But it's separate tunnels, so to speak, separate TCP

22  connections, so one would never get mixed up with another one or

23  Windows is failing.

24  Q.  And then lastly, I think you've covered this, but you said

03:50  25  you had that bug maybe eight years ago or whatever and the

116

1    result of it was it just didn't work.  It wasn't that it gave

2    false information, it just doesn't work.  Is that --

3    A.  Right.  It would just cause the program to stop working

4    because -- to put it in context, Windows allows for, you know,

03:50    5    the folder, all the folders and sub folders and the file name

6    can't exceed 260 characters.

7    Q.  Uh-huh.

8    A.  So the programmer said, okay, we're gonna limit it to 260

9    characters.  That's what Windows says.  But the problem is other

03:50    10    operating systems like a UNIX or Linux environment or Mac can

11    have even longer extensions, so we had to account for that.

12         So programmatically they're accounting for the fact

13    that some of these paths and file names could exceed 260, which

14    doesn't make Windows happy, but we had to account for it because

03:51    15    BitTorrent is not just unique to a Windows computer, it runs on

16    Mac and Linux and all these other operating systems.

17         But that was the extent of the bug.  And you're right,

18    Your Honor, it would just shut the program down.  It didn't

19    collect false information or give us false negatives or

03:51    20    positives, it just shut down.  So that's a case I will never

21    investigate.

22              THE COURT:  Okay.  Any follow-up?

23              MR. HUMBLE:  No, Your Honor.

24              THE COURT:  All right.

03:54    25              MR. DONOVAN:  I do have just a little follow-up based

117

1   on some of these questions and answers.  And I appreciate it,

2   Your Honor.

3                    FURTHER CROSS-EXAMINATION

4   BY MR. DONOVAN:

03:54   5   Q.  You would agree that an info hash is different than a hash

6   value for a file, correct?

7   A.  It is certainly different.

8   Q.  So the info hash is just saying, hey, I've got this

9   information and you want it or vice versa, and we're going to

03:54   10  now have this handshake and hookup, right?

11  A.  Well, it's more specific than a file hash.  I just want to

12  be clear.  Info hash is different.  It's a hash with

13  information.  But the information in hashes are the file names,

14  the file sizes, the SHA-1 hash of every piece.  So indirectly

03:58   15  the info hash actually defines the material being traded,

16  whether that be one file or 100 files.  So it's better than a

17  file hash.

18  Q.  Okay.  So that's -- so an info hash is different than a file

19  hash, right?

03:59   20  A.  Yes.

21  Q.  And then a file hash is different than the file itself,

22  right?

23  A.  It's the fingerprint or signature of the data.

24  Q.  But it's not the thumb, it's the thumb's fingerprint, right?

03:59   25  So it's not the same thing.

1    A.   (No audible response.)

2    Q.   So, in other words, if you can get a file hash, does that

3    give you the file?

4    A.   No.   The file hashing is a unidirectional thing.

04:00   5    Q.   It's an algorithm, right?

6    A.   Right.

7    Q.   It's a 40-digit hexadecimal whatever, it's not the file

8    itself, correct?

9    A.   Correct.

04:00   10    Q.   Okay.

11    A.   The hash points to the file.

12    Q.   Now, I think you testified earlier and correct me if I'm

13    wrong, the name of the file is inside the torrent, right?

14    A.   Yes.   And the [Indiscernible].

04:02   15    Q.   Okay.   And so, for example, like on Exhibit I believe it

16    was -- let me just make sure I'm getting this one right.

17            So on Exhibit 5 I believe, where it says "torrent file

18    fragments," right?

19    A.   Yeah.

04:02   20    Q.   And it has the -- you know, the name right there under the

21    name column.

22    A.   Yes.

23    Q.   Starting, you know, "022Asian," okay?

24    A.   Yes.

04:02   25    Q.   And then in the source column it's got the hash file

1   torrent, right?

2   A.   It's -- basically what it's done is it's named the torrent

3   by its info hash.

4   Q.   Right.  So that name is inside, like you said, the hash.

04:03   5   It's part of the information that's in the hash file.

6   A.   It's part of the information in the hash, so, yes.

7   Q.   But again, that's not the file itself.

8   A.   That is not the file --

9   Q.   And you don't contest again that the file that supposedly

04:03   10   was downloaded here two days in a row wasn't recovered later,

11   right?

12   A.   I don't contest that.  Although the other exhibit shows it

13   was there, the MRU.  That's the file, that's not the torrent.

14          Most recently used, which was Exhibit 6, show you that

04:03   15   file name including its extension.  That's when you open the

16   file in a video player, for instance.  And that was on May 22nd,

17   after the first investigation and just before the second

18   investigation.  MRU is the file.

19   Q.   Yeah.  Gotcha.  Now, you talked about false positives.  You

04:04   20   would agree that just because a false positive might be rare,

21   it's not impossible, right?

22   A.   Well, statistically speaking it's 1 and 1.4 quindecillion

23   or two to the 160th power.

24   Q.   That's of two hash values not matching, that's not the same

04:06   25   thing as whether or not there might be a false positive in a

1  software, which is a type of malfunction or bug in the software,

2  correct?

3  A.  Right.

4  Q.  So I'm not asking the odds of two hash values matching,

04:07  5  which I understand is an impossibly high number, I'm saying that

6  just because a false positive might be rare within this program

7  that we don't have access to, doesn't mean it's impossible.

8  A.  (No audible response.)

9  Q.  And I can --

04:07  10  A.  There's so many areas a false positive could be, you'd need

11  to define that further.  Because the data we receive as hashed,

12  it's impossible -- or at least two to the 160th power that that

13  is not the data that belongs to the torrent.

14  Q.  Let me put it -- can I put it this way?  Okay.  So you have

04:08  15  these hash values which are indicators of the file on the

16  computer, right?

17  A.  Are we -- the info hash of a torrent, is that what we're

18  talking about?

19  Q.  Or the torrent.  The torrent is not the file itself, it's an

04:08  20  indicator of the file, right?

21  A.  It's the instructions to download file.

22  Q.  Okay.  And we also have like this, you know, again most

23  recently used whatever with, you know, the extension, right?

24  But again, it's not the file itself.

04:09  25  A.  That's the file itself was touched which caused an entry,

121

1    MRU entry.

2    Q.  But an MRU entry is not the file.

3    A.  No, no, no, you're right.

4    Q.  Okay.

04:09    5    A.  It's just proof that the file was there.

6    Q.  And you've speculated that the reason the file isn't there

7    and only these indicators are there is because perhaps it was

8    deleted, right?

9    A.  Correct.

04:10    10    Q.  And that's possible.  It's also possible it was a false

11    positive; that the program reported the file as being there and

12    it really wasn't.  I'm not asking again about hash matches or --

13    I'm saying is that possible?

14    A.  It's not possible because the detailed log -- there's no way

04:11    15    he could have sent us 226 pieces with the corresponding hash

16    values unless it was present at that moment in time on his

17    computer.  So this, I say, no, it's impossible.

18    Q.  I'd like to ask you a hypothetical.  Okay?  Let's say the

19    Torrential Downpour Receptor, just like every other computer

04:12    20    program, whether it's Windows, Microsoft Excel, you name it,

21    whatever, has a bug in it.  And I understand you said there was

22    only one.  Let's say it has a bug in it, okay?  And it's not

23    performing properly.  Those log files are generated from the

24    program, correct?

04:12    25    A.  Correct.

1    Q.  So if there was a problem with the program there could also

2    be a problem with those log files.

3    A.  I don't -- I agree that if there's a problem with the

4    program it could affect the log file.  But what it couldn't do

04:12    5    is make 226 pieces match.  There's no possibility that the

6    computer at that IP address didn't possess that whole file

7    because he shared 226 matching pieces.  It's not a possibility.

8    Q.  But the log files which says it matched 226 pieces, fair?

9    A.  It is what it says, yes.

04:16    10    Q.  Okay.

11    A.  And so we would have had to get wrong and have it match 226

12    times.  It's just inconceivable to me.  I don't know how to

13    better answer your question.  I apologize.

14    Q.  I guess my final question would be:  So a false positive is

04:17    15    possible.

16    A.  Anything's possible.  But statistically speaking, I don't

17    believe it happened here.

18    Q.  I understand.

19            MR. DONOVAN:  I don't have any other questions,

04:17    20    Your Honor.

21            THE COURT:  All right.  Thank you, Mr. Erdely.

22            THE DEFENDANT:  Thank you, Your Honor.

23            (Witness excused at 4:42 p.m.)

24            THE COURT:  Mr. Donovan, what would you like to do?

04:20    25            MR. DONOVAN:  Well, Your Honor, I'm kinda torn.

123

1    Obviously I think this is complicated stuff.  I think we've

2    learned a lot today.  I know my expert whispered to me that he's

3    learned a lot today.  So I think we might have some of our

4    questions answered, but not all of them.

04:20   5         THE COURT:  I'm -- you know, when you have an expert

6    like Mr. Erdely come in, I don't get this stuff much, I don't

7    think the government wants to produce him over and over and

8    over, so it probably makes sense for me to write something.  And

9    if I'm going to write something on this, I think you should tell

04:21  10    me what you -- your position after hearing the evidence.

11         MR. DONOVAN:  Well, and that's what I was getting

12    towards, is I'm -- I think I'm leaning towards I'd like to get

13    the transcripts, have some time to review those, I guess do a

14    follow-up, you know, brief or, you know, position.

04:22  15         THE COURT:  Transcripts?  Can't you give me something

16    faster?  I mean, this case has been --

17         MR. DONOVAN:  I know.

18         THE COURT:  This is an 18 -- when was this filed, back

19    in July of last year?  And there were a lot of delays in getting

04:22  20    you as much as we did get.  Then you got an expert.

21         MR. DONOVAN:  I understand, Your Honor.  And I do

22    appreciate the Court's patience with this case because, again,

23    at least from my perspective, this has been complicated and

24    difficult to work through even with the expert because, again,

04:23  25    we have an asymmetry of information here trying to figure out

1    what's going on.

2         THE COURT:  What makes this case unique?  I mean, we

3    have all these child pornography cases.  Is it just that he's

4    charged with distribution and the files he was charged with

04:23    5    distributing weren't found on the -- the files themselves were

6    no longer -- or not found on his computer?

7         MR. DONOVAN:  I think that's exactly right.  I think

8    what the big difference we have here is that they're pretty

9    convinced that it must be because it was deleted.  Okay?

04:24    10    We're --

11         THE COURT:  There were a lot of files that were on the

12    computer, correct?  I mean, there's possession charges here.

13         MR. DONOVAN:  Yes, later.  Yes.  Count 2 relates to

14    the search warrant and the stuff that came from the search

04:26    15    warrant.  That's a simple possession charge.  Has no mandatory

16    minimum.

17         Count 1 relates only to these two downloads from

18    Torrential Downpour Receptor.  And that's what was not located

19    on the media.  And so --

04:27    20         THE COURT:  Did you know that there was -- 4, 5 and 6

21    showed that it was on the -- or at least there's pretty good

22    evidence that --

23         MR. DONOVAN:  Well, again, these are artifacts.  You

24    know, these are indicators, these aren't the files.  I mean,

04:27    25    this is -- this is what I was trying to get on my rebuttal

1    questions there.

2            THE COURT:  Yeah.

3            MR. DONOVAN:  4, 5 and 6 show things taken from the

4    system through a -- basically a forensic program, right?  And

04:27    5    they're indicators of the file, they're not the file.  I don't

6    think it's being disputed here and I think he even admitted

7    on --

8            THE COURT:  So I guess my question is:  Is this more a

9    question of the search or are we beyond that now and this is a

04:28    10   question of just your ability to assert your defense and --

11           MR. DONOVAN:  I think it's two things.  I think, one,

12   it's the ability to properly prepare for trial, should there be

13   a trial here, of the government witness who ran this program and

14   says that these things were downloaded because, again, they're

04:28    15   not later recovered, okay?

16           So the only evidence that the government's going to

17   present about that is what this program did and what it

18   supposedly observed and downloaded and generated logs about and

19   all of that.  That's how they're going to prove Count 1.

04:28    20           They're not going to prove Count 1 because it was

21   located later on his computer.  Count 1 is a distribution charge

22   that carries a five-year minimum, so that's obviously the one

23   that we're more concerned about.

24           And, I would also mention, Your Honor, what happened

04:29    25   in Count 1 during this program running is the sole basis of the

126

1    search warrant that is then later used to form the basis of

2    Count 2, to go get the warrant executed, locate whatever they

3    locate and then charge possession.

4         So I think it relates more directly to Count 1, and I

5    think that's what makes this case more unique than other cases

6    where they do later recover the file or whatever.  But it also

7    does impact Count 2.  And it impacts it on I think several

8    levels, but definitely preparing for trial and cross-examining

9    the government --

10         THE COURT:  Are you suggesting that the program

11    actually puts child pornography on the defendant's computer?

12         MR. DONOVAN:  No.  I don't think we have any

13    indication of that.  I'm not going to advance that.  I asked a

14    couple questions about that.

15         Again, I think the question for Count 1 is could this

16    be a false positive, which is why it's not there when they go

17    back later to look, versus he deleted it.

18         THE COURT:  So even if it's a false positive, let's

19    say, it's still probable cause.

20         MR. DONOVAN:  Yes.

21         THE COURT:  So --

22         MR. DONOVAN:  So in that case it could still support

23    Count 2.  But then it would not support Count 1 because that

24    would mean that it was never there.  Count 1 is that he, on a

25    specific date, distributed this specific file.

127

1          THE COURT:  Well, they'd still get to a jury on

2     Count 1 because they'd certainly be able to argue from the logs

3     and the search of the computer, the mirrored computer, the data

4     they have there; that he actually possessed it, he just deleted

04:31  5     it.

6          MR. DONOVAN:  Yes, I think that could get to the jury.

7     That could be arguable.  That's where we're handicapped because

8     we don't have access to this program and can't question its

9     reliability, accuracy.  I mean, this is the problem.

04:31  10    Everything, with all due respect to the government witness,

11    is --

12         THE COURT:  Okay.  Let's say it takes a week to get a

13    transcript.  When will I see your brief?

14         MR. DONOVAN:  Well, Your Honor, I'm on vacation from

04:32  15    August 23rd until September 2nd, so I think that's the day

16    before Labor Day.  I mean, I'll do it as fast as I can after

17    that, but my, you know --

18         THE COURT:  Okay.  So how about September 10th.  15th?

19         MR. DONOVAN:  Sure.  I'm assuming that the transcript

04:32  20    hopefully comes through.

21         THE COURT:  September 15th for your brief, Mr. Humble?

22         MR. HUMBLE:  Whatever you'd like, Judge.

23         I'll just say, we were told -- and I know it's on the

24    recordings -- repeatedly when we were having these continued --

04:32  25    what am I -- adjournments to --

128

1        THE COURT:  Status conferences.

2        MR. HUMBLE:  Correct.  -- that this was dispositive;

3   that there wasn't going to be a trial.  I understand --

4        THE COURT:  This motion would be dispositive.

5        MR. HUMBLE:  I understand things change.

6        THE COURT:  Yeah.

7        MR. HUMBLE:  But it was repeatedly asserted by counsel

8   that this was dispositive, that there wasn't going to be a

9   trial, but this was the issue that we were basically going to

10  battle out.  Now that's not what I'm hearing.  So....

11       THE COURT:  Well, my sense is if he's -- if the

12  motion's denied am I likely to see a -- then it's probably not a

13  trial.

14       MR. DONOVAN:  Well, that's exactly what I meant when I

15  said dispositive before.  Obviously if we don't get this, that

16  changes things drastically I think from our perspective and then

17  it probably -- yeah, I don't know at that point how we could

18  effectively even prepare for trial.  If it's granted, then that

19  would be a different story because then we could actually maybe

20  get even further answers than what we've gotten so far.

21       THE COURT:  Yeah.  30 days after his.  And the sooner

22  the better.  And then if you want to reply, 10 days later,

23  Mr. Donovan.

24       MR. DONOVAN:  Okay.

25       THE COURT:  And I appreciate this is delayed, but I

1    take it there's been compliance.  There's no noncompliance with

2    conditions of bail as with most of these cases?

3              MR. DONOVAN:  Correct, he's been --

4              THE COURT:  And frankly I -- you know, this is very

04:34   5    unusual.  If the government needs to go through this on every

6    child pornography case, that's -- we're going to see far fewer.

7    You can't -- and the government has made the effort of calling

8    an expert who frankly is acknowledged as the expert on this

9    program.  So I think since they've made that record I'll try and

04:35   10   give you something that will have some value.

11             MR. DONOVAN:  Thank you.  I would just note September

12   15th's a Sunday.  Can we do September 16th which is Monday?

13             THE COURT:  Sure.  Any day I selected that is a

14   weekend, take the next day.

04:35   15             MR. DONOVAN:  Okay, thank you.

16             THE COURT:  All right.  Anything else today?

17             MR. HUMBLE:  Not from the government.

18             THE COURT:  All right.  Thank you, all.

19             MR. HUMBLE:  Thank you.

04:36   20             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

21             (Hearing adjourned at 4:49:46 p.m.)

22                         *     *     *

23

24

25

C E R T I F I C A T E

       I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified August 30, 2019.

<u>/s/John T. Schindhelm</u>

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR<br>
United States Official Reporter<br>
517 E Wisconsin Ave., Rm 236,<br>
Milwaukee, WI 53202<br>
Website: WWW.JOHNSCHINDHELM.COM

```
 1                   I N D E X

 2   WITNESS   EXAMINATION                                PAGE

 3   PEYTON ENGEL, DEFENSE WITNESS

 4        DIRECT EXAMINATION BY MR. DONOVAN................    3

 5        CROSS-EXAMINATION BY MR. HUMBLE.................   37

 6        REDIRECT EXAMINATION BY MR. DONOVAN.............   45

 7   ROBERT ERDELY, GOVERNMENT WITNESS

 8        DIRECT EXAMINATION BY MR. HUMBLE................   50

 9        CROSS-EXAMINATION BY MR. DONOVAN................   90

10        EXAMINATION BY THE COURT........................  114

11        FURTHER CROSS-EXAMINATION BY MR. DONOVAN........  118

12

13                        * * * * *

14                   E X H I B I T S

15   NUMBER           DESCRIPTION            OFFERED  ADMITTED

16     1      Erdely CV................................50     50

17     1      CV of Robert Erdely......................90     90

18     2      Investigative log for download 5/21/18.....90     90

19     3      Investigative log for download 5/22/18.....90     90

20     4      Installed Programs.........................90     90

21     5      Torrent Files..............................90     90

22     6      MRU Recent Files and Folders...............90     90

23

24

25
```

132