UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION
------------------------------------------------------------
UNITED STATES OF AMERICA,          )
                                   )
                   Plaintiff,      )  Case No. CR 18-157
                                   )  Green Bay, Wisconsin
     vs.                           )
                                   )  December 17, 2019
THOMAS J. OWENS,                   )  1:30 p.m.
                                   )
                   Defendant.      )

------------------------------------------------------------

**TRANSCRIPT OF CONTINUED ORAL ARGUMENT**
**Re: Defendant's Motion to Compel**

BEFORE THE HONORABLE WILLIAM C. GRIESBACH
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

  For the Government:       United States Dept of Justice (ED-WI)
                           By: DANIEL R. HUMBLE
                           Office of the US Attorney
                           205 Doty St - Ste 301
                           Green Bay, WI 54301
                           Ph: 920-884-1066
                           Fax: 920-884-2997
                           Daniel.Humble@usdoj.gov
  For the Defendant
THOMAS J. OWENS:           Pruhs & Donovan SC
  (Present)                By: CHRISTOPHER D. DONOVAN
                           757 N Broadway - Ste 401
                           Milwaukee, WI 53202
                           Ph: 414-221-1950
                           Fax: 414-221-1959
                           Donovanc34@hotmail.com

  U.S. Official Transcriber:   JOHN T. SCHINDHELM, RMR, CRR,
  Transcript Orders:           WWW.JOHNSCHINDHELM.COM

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.



1

1      TRANSCRIPT OF PROCEEDINGS

2      Transcribed From Audio Recording

3                    *      *      *

4            THE COURT:  Be seated.

5            THE CLERK:  The Court calls Case No. 18-CR-157, United

6      States of America vs. Thomas J. Owens for oral argument

7      regarding defendant's motion to compel.

8            May I have the appearances, please?

9            MR. HUMBLE:  Dan Humble for the government.  Good

10     afternoon, Your Honor.

11           MR. DONOVAN:  Attorney Chris Donovan on behalf of

12     Mr. Owens, who is here in person.  Good afternoon.

13           THE COURT:  Good afternoon.

14           So I thought maybe a good way to approach this —

15     you've done briefing and we've had evidence — is to -- for me to

16     ask questions and go back and forth.

17           So, Mr. Humble, first of all, I understand the

18     distribution count is really the button that's at issue here.

19     Although Mr. Donovan makes an argument that he needs it to

20     investigate potential Fourth Amendment violations.  But it's

21     primarily the distribution count, it seems to me, which your

22     evidence sounds like it consists of the downloading of the video

23     showing child pornography from Mr. Owens' computer on two

24     separate occasions.  And the logs that go with that.  And that

25     downloading provides the basis of the distribution charge which

1   is a five-year mandatory.

2           MR. HUMBLE:  Correct.  Yeah, peer-to-peer.

3           THE COURT:  Right.  And the issue at least initially

4   surfaced that since the same video was not located or found on

5   the computer when the search warrant was executed and the

6   forensic examination was done, there was reason to question

7   whether or not the evidence obtained through the Torrential

8   Downpour Receptor was genuine, whether it was -- there was a

9   malfunction or something.  And I understand from Mr. -- or

10  Detective Erdely's -- Retired-Detective Erdely's testimony that

11  he did find evidence that it was there during the period of time

12  on three separate occasions.

13          But I guess my initial question to you is, in most of

14  the cases we see here the actual download isn't that pertinent

15  because they find -- either they find the same video or the same

16  evidence on the computer or they find other evidence.  And I'm

17  wondering, did the forensic examination of the computer in this

18  case, are you able to determine -- or is a forensic expert able

19  to determine that other child pornography that's found on the

20  computer was, in fact, downloaded, was distributed to other

21  individuals?  Is that -- go ahead.

22          MR. HUMBLE:  Judge, I don't know that they ever looked

23  beyond this particular one that was charged in the indictment.

24  Obviously Detective Erdely spent just a few minutes at my

25  computer back in the office prior to that testimony that day and

1  obviously found other evidence that it had been there at

2  different times.  We have not gone back because we've had a

3  motion essentially on this file --

4  THE COURT:  Yeah, your entire -- I mean, you indicted

5  him on distribution of this particular file.

6  MR. HUMBLE:  Correct.

7  THE COURT:  The one file that was obviously deleted or

8  not there.  And that's what makes this TDR program, that's what

9  gives the basis for the argument that it needs to be disclosed

10  because that forms the basis of that charge.

11  So I'm just wondering, is there an easy way to

12  circumvent this whole issue by asking your forensic people if

13  you wanted just -- I mean, is that typically -- I see

14  distribution charges all the time and seldom -- I mean, this

15  issue doesn't arise.  So I'm wondering, is this an issue you've

16  created?  Is it in the case or is it one that -- and you want to

17  fight it all the way to the end, or --

18  MR. HUMBLE:  Well, seeing as how I drafted the

19  indictment, I guess, yes, I created the problem.  But I would --

20  I guess I could best answer your question by saying based on the

21  expertise of Detective Erdely when he kind of looked at what he

22  looked at, and you have to remember he really had nothing to do

23  with this case as he testified until maybe two weeks ahead of

24  time.

25  THE COURT:  Right.  But he teaches at Fox Valley Tech,

1    does he?  On occasion?

2              MR. HUMBLE:  Occasionally, yes.

3              THE COURT:  Okay.

4              MR. HUMBLE:  His comments to me were that he had just

5    scratched the surface.  And I suspect that if he got in there he

6    would find other files similarly distributed or received.  So

7    ....

8              THE COURT:  That's kind of my question.  Does a

9    typical forensic examination yield information that the child

10   pornography that is actually found on the computer was, in fact,

11   distributed?

12             MR. HUMBLE:  I believe in this case once they're aware

13   of a particular file, that's what they're looking for.

14             THE COURT:  Right.

15             MR. HUMBLE:  As opposed to trying to go back to square

16   one and take a whole comprehensive look.

17             THE COURT:  And, of course, that -- you know, this is

18   the charge.  And so it's just -- it's more of a pragmatic

19   question than a legal question there.

20             Let me go on.  Mr. Donovan objects to the claim that

21   the government has provided the defense access to demonstrations

22   and controlled validation testing of TDR.  He says, "To be clear

23   ..."

24             And I'm looking at his reply, post-hearing reply,

25   document 28, page 2.  At the bottom there he says, "To be clear,

1    the defense in this case has been offered absolutely no access

2    to TDR whatsoever, and this is confirmed by the government's

3    expert where he testified that he's done demonstrations for

4    defense counsel before, but not in this case."

5         And I'm wondering, he quotes you as saying that

6    defense was given access to demonstrations and controlled

7    validation testing of TDR.  What if -- I mean, I understand the

8    government has handed over certain information to the defense

9    concerning TDR, but what specifically was handed over?

10        MR. HUMBLE:  Judge, in reviewing the documents prior

11   to this hearing today, I would have to agree that went too far.

12   I did not author this response.

13        THE COURT:  Uh-huh.

14        MR. HUMBLE:  Certainly my name's on it so I take

15   responsibility for that.

16        THE COURT:  Yeah.

17        MR. HUMBLE:  When I initially read this I read that as

18   meshing the testimony of Detective Erdely with the fact that the

19   logs really make out confirmation of all of the testing that had

20   been done.  But I do think it was a step too far to say that

21   they've made available the testing, because clearly the exchange

22   between Detective Erdely was he has done this in the past for

23   defense counsel, but that I think was misinterpreted as for this

24   defense counsel, which is not the case.

25        And, again, when I read it initially prior to filing,

1    I was looking at it in the view of a lot of Detective Erdely's

2    testimony that the logs confirmed the testing, and essentially

3    it's -- it's not possible that -- that the logs wouldn't reflect

4    some type of error.

5            But, no, that testing that Detective Erdely talked

6    about has not been made available to Mr. Donovan or his client.

7            THE COURT:  Okay.  Is there testing by other agencies,

8    outside agencies done in a general manner that could be made

9    available or is made available in this type of case?  Is

10   there --

11           MR. HUMBLE:  Judge, I think -- are you asking me?  I'm

12   sorry.

13           THE COURT:  Yes.

14           MR. HUMBLE:  The only one that I would know of is what

15   Detective Erdely said, that -- I believe he was asked the

16   question, "Did you bring something here today to demonstrate in

17   court?"  And he said -- that's when he essentially said, "I've

18   only been on this case for about two weeks, so, no."

19           THE COURT:  Yeah.

20           MR. HUMBLE:  I mean, in theory I think that's

21   something that could be set up.  If he's done it for someone

22   else then he could certainly do it for Mr. Donovan.  But I'm not

23   sure that if -- is that where we stop, is my question.  Is that

24   satisfactory enough to have that type of --

25           It sounded from the cross-examination that would not

1  be satisfactory enough, that type of testing.

2          THE COURT:  And the type of testing would be -- you're

3  talking about is --

4          MR. HUMBLE:  It wasn't access to the software.  I

5  believe it was Detective Erdely essentially setting up both ends

6  of the demonstration of the peer-to-peer and kind of just

7  running it through a demonstration.  That's my recollection of

8  the testimony.

9          THE COURT:  Now, much of this -- TDR is a modification

10  of the -- of the BitTorrent program, as I understand it.  And,

11  of course, to understand TDR you would want to understand

12  BitTorrent program.  And that's primary what you need to know.

13          And, of course, there is no restriction on the defense

14  ability to investigate or study or look at BitTorrent

15  programming.  What TDR is unique or its unique ability is to --

16  is to do single source.  Limit the torrents that it receives to

17  a single source and then document and identify the IP address

18  where that's coming from, as I understand it.

19          And when -- in talking about the defense expert, his

20  testimony, he described the kind of testing he envisioned as

21  somehow doing packet capture or packet sniffing, which would

22  allow him to watch the network in a single-source download from

23  one computer to another to verify TDR works as claimed.

24          He talked of doing this, if I recall correctly,

25  without accessing child pornography.  Does TDR, does it operate

1  in such a fashion where you could show the single-source

2  download without accessing child pornography?

3          MR. HUMBLE:  Judge, I believe his testimony --

4  Detective Erdely's testimony was that that -- he was asked

5  almost that specific question and he said that wouldn't be

6  possible because it would essentially expose the whole nature of

7  the program, even if you were trying to avoid child pornography.

8          I don't have that marked in front of me, but that was

9  my recollection of what I just read prior to the hearing.

10          THE COURT:  Do you think that the -- the first element

11 or the first issue to be resolved is whether or not defense has

12 established that this evidence is material to the defense.  And

13 do you think that they've established that?

14          MR. HUMBLE:  I don't.

15          THE COURT:  And basically what's your argument there?

16          MR. HUMBLE:  Judge, I don't see how it's -- well, I

17 haven't seen -- other than the claim that --

18          THE COURT:  Computers have bugs.

19          MR. HUMBLE:  -- computers have bugs --

20          THE COURT:  Yeah.

21          MR. HUMBLE:  -- I haven't seen really anything other

22 than that to say there's something that gives them an avenue to

23 this type of testing.

24          THE COURT:  Uh-huh.

25          MR. HUMBLE:  And the other *Owens* case that was in the

1  Eastern District which was cited to, I think they referred to as

2  fishing expedition.  I think that's what this is.  I mean, it's

3  -- let's keep pushing.  And my recollection from the --

4      THE COURT:  What was the other *Owens* case?  Was

5  that -- is that mine?

6      MR. HUMBLE:  No, that was down in --

7      THE COURT:  Milwaukee?  Judge --

8      MR. HUMBLE:  -- in -- I know Ben Proctor handled it.

9  I think it was in front of Judge Adelman --

10     THE COURT:  Judge Adelman.

11     MR. HUMBLE:  -- a few years back.

12     THE COURT:  Mr. Donovan, were you on that one, too?

13     MR. DONOVAN:  I wasn't on that one.  I was on *Feldman*.

14     THE COURT:  *Feldman*.  Yeah, that's the other one.  We

15  had the one with the NIP.  That was --

16     MR. HUMBLE:  I think that was Mr. Roach's case

17  probably.

18     THE COURT:  Yeah, that was *Kienast.*  Someone like

19  that.  Okay.  And that didn't raise these issues.  Go ahead, I

20  cut you off.

21     MR. HUMBLE:  But, no, Judge, I think it is the true

22  definition of a fishing expedition.  It's like let's -- we don't

23  know what we don't know, so let's get in there and crack it open

24  and find out based on the theory that every computer program has

25  bugs which --

1        THE COURT:  What does that mean?

2        MR. HUMBLE:  I don't know if that's true or not.

3        THE COURT:  What -- well, and what does a bug mean?

4  It seems to me that Detective Erdely testified that if there's a

5  bug it just doesn't work.  It's not like you get a false

6  positive.

7        MR. HUMBLE:  He was very confident on that.  I agree

8  with what the Court just stated.  He also -- it's my

9  recollection he was very strong that if there had been some type

10  of problem it would be reflected in those logs that are -- the

11  whole purpose of the logs is essentially to confirm that

12  everything's going okay.

13        He also talked about the probabilities and also the

14  fact that there had only been one instance having to do with the

15  length of the characters in the file name.  And that was --

16        THE COURT:  And the result was it didn't download

17  anything.

18        MR. HUMBLE:  It didn't work, yeah.

19        THE COURT:  Yeah.  So, one, you don't think the

20  government -- or the defense has established materiality.  And

21  two, you don't think that they have -- they have overcome the

22  law enforcement privilege.

23        But let's talk about the law enforcement privilege.

24  It's your obligation to show this would be privileged and there

25  would be some damage to the public interest in disclosing.

1    Now, there's something you can do.  I think you've

2    conceded that you could allow Mr. Donovan -- Mr. Erdely could

3    show him some testing, some single-source stuff that -- but you

4    don't think that would satisfy the defense.

5    MR. HUMBLE:  Again, I don't know.  It didn't sound

6    like it in the exchange that I recall and that I read from the

7    testimony.

8    But, again, I think that's indicative of we want to

9    keep going forward here until eventually either the Court says

10   full access, in which case I guess now it would be up to

11   Detective Erdely if they would do that, but --

12   THE COURT:  And full access would mean -- I mean,

13   his -- the defense expert wanted to receive the program, take it

14   to his office and fiddle with it.  I mean, you know, look at

15   these, what do you call it, the packet capture, packet sniffing,

16   download things and promise not to disclose it.

17   MR. HUMBLE:  And maybe this is unfair, but if I was

18   going to be one of the first experts to ever have access to

19   this, that would certainly increase my value as an expert in

20   these types of cases moving forward.

21   And as Detective Erdely testified, you know,

22   essentially if somebody gets in, then everybody essentially

23   can -- the cat can be out of the bag and everybody can know

24   what's going on here, especially with the database of hash

25   values.  And the very people that you don't want to know about

1  how this works would -- there's a good possibility they would

2  find out.

3       THE COURT:  The hash values, which Detective Erdely

4  said have been built up over years, they have accumulated this

5  inventory of hash values, and what's unique about them is that

6  this is the -- these are the specific items of child pornography

7  that they have now collected and that they looked for.  And

8  these are known child pornography depictions, either videos or

9  still or whatever collections.  And those are -- those are

10  valuable because they -- their computer is designed -- the

11  program is designed to identify them and to download them.  And

12  then that gives them the key information here.

13       The concern is that if these are disclosed, then

14  individuals would be able to either not search for those or

15  modify the hash values by which their preferred child

16  pornography is available or would be identified by.

17       MR. HUMBLE:  Correct.  I believe he even testified you

18  could change one alphanumeric character and that would be a

19  problem as well, because now the system's no longer looking for

20  that particular known image.

21       THE COURT:  And he didn't think there was a way of

22  providing access to this without disclosing that or making it

23  available to the --

24       MR. HUMBLE:  Correct.

25       THE COURT:  Is there another -- other than the hash

1  values, was there other information connected with the -- with

2  the way in which this works that you think would be covered by

3  the law enforcement privilege, the law enforcement investigatory

4  privilege?

5  MR. HUMBLE:  Well, I think, again, along the lines of

6  the other *Owens* case, the manuals and those types of things, any

7  type of white papers, those types of things were not turned over

8  in that case, I don't believe, for similar reasons that you

9  don't want that type of information out on the street.

10  Detective Erdely I think said it would be the equivalent of

11  dropping somebody into a police briefing raid.

12  THE COURT:  Right.  The -- in the other *Owens* case,

13  was it a -- was there a distribution claim like this that

14  depended upon the download?

15  I know in *Feldman* it was not.  Nor in *Hoeffener*, which

16  is a district court case out of Missouri.  They were not charged

17  with distribution of child pornography based on download --

18  downloads from the Torrential Downpour program.  So in both of

19  those cases the court found that there was no need to disclose

20  those things.  I think the only argument was a Fourth Amendment

21  argument.

22  MR. HUMBLE:  Yeah, that was a -- an IT case.  So I

23  don't believe that there was distribution, it was more that

24  Operation PlayPen situation.

25  THE COURT:  Say that again?  What was the operation?

14

1              MR. HUMBLE:  PlayPen, which --

2              THE COURT:  Was that the discovery -- was that what

3    led to the NIP?

4              MR. HUMBLE:  I believe so.  There were a lot of

5    challenges nationwide to that --

6              THE COURT:  Yeah.

7              MR. HUMBLE:  -- on a variety of reasons.  Basically

8    the FBI had taken control of the website.

9              THE COURT:  Right.  That was *Kienast*.  The version I

10   had was *Kienast*.  But there was a different version in *Owens*, a

11   different attack on the same thing.  Okay.

12             MR. HUMBLE:  Yes.

13             THE COURT:  Anything else you want to tell me before I

14   go to Mr. Donovan?

15             MR. HUMBLE:  No, Judge.

16             THE COURT:  Okay.

17             MR. HUMBLE:  I think we've briefed this obviously

18   numerous times.

19             THE COURT:  Right.  Yeah.  I'm sorry.

20             MR. HUMBLE:  No, no, no.

21             THE COURT:  I mean, it's not -- I mean, this is a

22   foreign language to me and it's -- and there really isn't, you

23   know, a lot of authority.  I mean, there's a number of cases,

24   but this has some unique differences.

25             Well, Mr. Donovan, you say TDR is a witness, you get

1    to cross-examine the witness.  It's not a witness, it's a

2    computer program.  Somebody has to testify about it.  You get to

3    cross-examine them.  But I'm not sure -- on materiality, tell me

4    how you think you've established the materiality.

5          MR. DONOVAN:  Well, I think this is similar to some of

6    the cases I cited from out of circuit that go back to the '70s

7    where it's like an IRS Agent is testifying about what a computer

8    program did for like tax records.

9          I mean, you're right.  I mean, I can't put the program

10    up, just like they couldn't put the IRS tax program up.  But how

11    can I intelligently cross-examine the witness who set it up,

12    programmed it, ran it, however you want to phrase it, without

13    having access to the program?

14          And that's what those older cases talked about.  And

15    obviously it's a different type of program and it does different

16    things, but I think the idea is the same.  Which is like to

17    effectively cross-examine whatever witness will testify to what

18    TDR does, my hands are tied.

19          THE COURT:  Well, you understand what -- what

20    BitTorrent does.  You understand that program.

21          MR. DONOVAN:  My expert does presumably, yes.

22          THE COURT:  And will teach you by the time you

23    cross-examine.  So you understand --

24          MR. DONOVAN:  Sure.

25          THE COURT:  -- the principles of how that works.  And

1    you have --

2              MR. DONOVAN:  But, Judge, if I could --

3              THE COURT:  Yeah.

4              MR. DONOVAN:  -- I mean, you know, I don't know I

5    agree that TDR is just a subset of BitTorrent.  Because it's

6    like, okay, you know, you have Windows, all the programs you

7    have on Windows runs on Windows.  So that's like saying Word and

8    Excel and whatever other program you might have is just a subset

9    of Windows.

10             I don't think that's accurate.  I mean, Windows is the

11   environment it runs in and BitTorrent is the environment TDR

12   runs in.  But we don't know that TDR is not a standalone program

13   that can do X, Y, or Z.  Again, you know, we just -- we don't

14   have access, we can't answer that question.

15             You know, I know that you asked Mr. Humble just now

16   about, well, what about, you know, not disclosing hash values.

17   Like, for example, one answer that we haven't gotten still, is

18   where are these hash values stored?  Are they in the program

19   themselves?  Are they in the source code?  Or is it what my

20   expert tells me more likely, a separate extension or separate

21   application that plugs into TDR, which I think means that then

22   that could be withheld and TDR itself could be examined without

23   the access to hash values.

24             As I hopefully made clear, we don't want the hash

25   values.  We're not asking for the hash values.  And I don't

1    think we've ever gotten a straight answer on that.

2            And I thought that Mr. Elderly also did say that there

3    is a way to do testing with benign files.  I thought I remember

4    explicitly asking him that on cross-examination, and I thought

5    the answer was yes.  I don't know if I can try to find that in

6    the transcript quickly.  I don't have an electronic version with

7    me.  If I did, I would search for the word "benign."  I don't

8    know if Mr. Humble could.  But I thought he had said there was a

9    way to do this without actually using child pornography images.

10           THE COURT:  Try page 109.

11           MR. DONOVAN:  Yeah, that's what I just was looking at.

12   So this is where I think I asked him, you know, when you're

13   doing this training, your validation testing, you know, you're

14   controlling both computers.

15           He says, "Correct."

16           And then I say, "Are you actually transferring child

17   pornography, or is it just a benign file or something else?"

18           And he says, "It's a benign file."

19           And then I said, "Well, why can't that be done for the

20   defense?"

21           And then he has an explanation on pages 109 to the top

22   of 110 of why we couldn't do that.

23           And, again, he kind of focuses on this hash value

24   thing which, again, I don't know that that's been answered

25   clearly.

1       And, you know, I don't know if Mr. Humble knows the

2   answer or not, but my expert tells me it's highly likely that

3   those values would not be part of the program itself.  It would

4   be a separate library or a separate, you know, plug-in or

5   extension, because they're constantly being updated.

6       I think it was clear that he testified he is a

7   gatekeeper.  He is the one who controls all the hash values that

8   go in or out.  So I would be surprised if it was built into the

9   program itself.

10       THE COURT:  Let's see, he says, "Well, it exposes all

11   those other things to our system.

12       "Again, once you have a license to our software, you

13   see active investigations, you see contact information for the

14   investigators, you would learn all of our hash values, all the

15   info hashes of the torrents.  But it is possible to set up a

16   torrent with data that is not child pornography, but it takes my

17   involvement.

18       "Well, in fact, so you've done that before for the

19   defense counsel, right?

20       "Done what?

21       "A demonstration or a validation testing.

22       "I've done demonstrations.  But when I do

23   demonstrations I can just actually -- I can actually just

24   transfer child pornography.  In my test I run the system, I

25   actually download {Indiscernible} log.  I don't have to show

1    them the movie file that gets downloaded.  But additionally, we

2    have offered a validation test -- although it's in-house, we've

3    offered a validation test I think for {Indiscernible}."

4        Mr. Donovan, Mr. Humble suggests that there's

5    something that could be done, but it wouldn't satisfy the

6    defense.  That type of validation testing, for example.  Now, my

7    hunch is nothing will satisfy you, but would that help?

8        MR. DONOVAN:  I mean, we would always be open to

9    taking whatever we can get.  But I tend to agree.  I don't know

10   that that --

11       My understanding is that they control, you know, both

12   computers and they show a single-source download or whatever

13   they think they can show, but we can't manipulate it, test it,

14   look at it ourselves, review it, you know, determine its

15   reliability.

16       I mean, I wanna say no.  I mean, I'd have an open

17   mind, but I do think that that probably is not enough compared

18   to what we've asked for.

19       THE COURT:  Right.  The fact is, it sounds to me like

20   your position and -- is that either you dismiss the distribution

21   or you give us what we've asked for.

22       And, you know, the argument -- the question is, do you

23   need what you've asked for?  Obviously there's a -- it's a

24   strategic advantage for you to ask for it even if you don't need

25   it if it requires dismissal or the government, you know, giving

1  up its privilege, which the government from the sounds of it

2  doesn't feel it could reasonably do.  Although I don't know if

3  it's going to -- I suppose it could sacrifice a distribution

4  charge in this case in order to avoid giving up its

5  investigatory privilege, especially if that distribution charge

6  could be obtained through other evidence.

7         But, in any event, it seems that's where we are.  Do

8  you think that that's a fair statement?

9         MR. DONOVAN:  I think that's fair.  I mean, they're

10  the ones that, you know, choose to investigate cases this way,

11  which I understand why we do that.  And it's certainly valuable

12  for law enforcement.  They choose the charge.  And he did that

13  here.  Mr. Humble, you know, did a distribution charge, not just

14  the possession or not just, you know, other options he had open.

15  And so that puts this squarely in play.  And this is an element

16  of the offense.

17         THE COURT:  Uh-huh.

18         MR. DONOVAN:  And, you know, the way I look at this

19  argument is, if this was any other -- and I know you -- I

20  respect Your Honor saying it's not a witness, the program

21  itself.

22         THE COURT:  Yeah.

23         MR. DONOVAN:  But effectively it is the program that

24  can prove the elements of this offense through a human witness.

25         THE COURT:  Uh-huh.  And that's what you're really

21

1    saying.  For you to be effectively cross-examining the witness

2    that will present this evidence, you need to know about the

3    program.

4            MR. DONOVAN:  Yes.  And so for any other witness that

5    would have key information -- I mean, this is really

6    transactional.  You know, this isn't background.  This isn't

7    like tangential stuff.  This is transactional to the elements of

8    the offense charged.

9            If this was an undercover drug scene -- and this is

10   why I think *Roviaro* is pretty on point -- you know, we would be

11   able to access not only their identity, but, you know, what

12   compensation have they been offered, what leniency, what other

13   crimes have they committed, what other times have they maybe

14   lied to police, what other times have they provided unreliable

15   information.  I mean, we would have a whole -- a whole fertile

16   field to investigate to attack that witness, which is part of

17   presenting the defense.

18           THE COURT:  Yeah.

19           MR. DONOVAN:  And here our hands are tied because on

20   the one hand they're saying, well, we want to charge you with a

21   very serious five-year mandatory minimum crime, but on the other

22   hand you can't have what effectively proves the crime.

23           THE COURT:  Uh-huh.

24           MR. DONOVAN:  And the Supreme Court in *Roviaro* and

25   other cases that I cite, you know, hasn't had a problem saying,

1   well, government, when that's your position, you have a choice

2   to make.

3           THE COURT:  Right.  If that's the situation we're in.

4   I don't think there's any dispute that if this is necessary in

5   order for your client to receive a fair trial, it has to be

6   disclosed.  The question is, is it necessary for your client to

7   receive a fair trial?

8           MR. DONOVAN:  And, Your Honor, just to clarify, I'm

9   not sure that that's the correct standard.  I think it's is it

10  relevant and helpful to the defense.  Not necessarily necessary.

11  Relevant and helpful.  Or needed to reach a fair determination

12  of the case.  And so --

13          THE COURT:  I'm not sure that's -- I'm disagreeing,

14  but --

15          MR. DONOVAN:  Okay.

16          THE COURT:  -- I understand that the language might be

17  different than I just stated.

18          Okay.  Mr. Humble, what's your -- anything further on

19  this?

20          MR. HUMBLE:  Well, just --

21          THE COURT:  What's your response to Mr. Donovan's

22  argument that, look, for him to be able to effectively

23  cross-examine the prosecution witness, and I don't know if it's

24  Mr. Erdely or who will testify, he needs to understand the

25  operation and workings of the program?

1          MR. HUMBLE:  I think we had effective

2     cross-examination.  We had about a four-hour hearing, didn't we?

3     Or maybe three hours?  I think that was a vigorous

4     cross-examination.  I think questions were asked, answers were

5     given.  And there weren't a lot of inconsistencies.

6          And maybe it didn't answer every single question, but

7     the opportunity to ask those questions certainly was afforded.

8     I don't see why that would be any different at a trial.

9          Obviously Detective Erdely was attacked.  And I don't

10    mean that in that way.  But obviously he was questioned quite

11    vigorously on many different avenues including based off with

12    the assistance of the defense expert.

13          So, I mean, I think that was effective

14    cross-examination.  And I -- I don't agree that the computer

15    system is the equivalent of a CI at a drug case.  And --

16          THE COURT:  It may malfunction, but it won't lie.

17          MR. HUMBLE:  Well, true.  And as you heard from

18    Detective Erdely, I mean, when are we going to see the CI in a

19    drug case who is two to the one hundred and sixtieth power

20    accurate?  We're not.  Because that's a human and this is a

21    computer program that has logs that show that it was working

22    effectively.

23          And as we talked about earlier, were it not working

24    effectively it would not work.  So ....

25          THE COURT:  Okay.

24

1          MR. HUMBLE:  Trying to prove the infallibility I think

2    is -- I understand why it's being asked for, but I just don't --

3    I don't see it here, Your Honor.  And I don't see how it's all

4    that material, quit frankly.

5          THE COURT:  Okay.  Anything else?

6          MR. DONOVAN:  A couple points, Your Honor.  You know,

7    I disagree that if it -- if it has a bug it would either just

8    not work or work.  I think there's variations and degrees.  I

9    don't think that's necessarily a fact that was testified to --

10   well, I mean, I think Mr. Erdely did say that, but I don't

11   accept that or agree with that.

12         THE COURT:  Uh-huh.

13         MR. DONOVAN:  And I -- you know, and I don't see how

14   that hearing that we had in August is a substitute for what

15   we're asking for, because we have a huge discrepancy here.  And

16   I know the government wants to downplay it.  And the government

17   thinks it can easily prove that the discrepancy is Mr. Owens

18   deleted the file.

19         But our whole position and theory would be it can also

20   be a false positive.  And, in fact, Mr. Erdely finally, at the

21   very end of I believe my recross, did technically say it.  This

22   is on page 123.

23         "I guess my final question would be:  So a false

24   positive is possible."

25         And he says, "Anything's possible, but statistically

1    speaking I don't believe it happened here."

2           So we should have the right to explore that

3    discrepancy.  With all due respect to Mr. Erdely, everything he

4    testified to is ipse dixit.  It's that this is what it is

5    because I say it is.  And we have no way to counter that.  We

6    have no effective way to test that, to review that, to

7    independently dig into it to see if he's accurate or not

8    accurate on all these assertions.  And there was a lot of

9    assertions that he made that very well might be true, but,

10   again, we have no way to know.

11          And the government, again, is who put this at issue by

12   charging the case the way that they charged it.  And we're just

13   pursuing the constitutional rights that Mr. Owens has to defend

14   himself.

15          THE COURT:  Okay.  Anything else?

16          MR. HUMBLE:  No.

17          THE COURT:  All right.  I'll issue a decision in short

18   order and then we'll get this case headed for resolution.

19          I take it if I disclose this there could be a further

20   motion practice.  If I order it disclosed.

21          Well, we'll wait and see.  I've got a fair -- you

22   know -- I'm fairly well along in it.  I just have these

23   questions and so I wanted especially to touch base on the

24   assertion that some of the testing had been provided.  So I

25   appreciate clearing that up.

1        MR. HUMBLE:  And I apologize for that.

2        THE COURT:  Well, we got it cleared.  Good.  You can

3   go yell at whoever did that to you.

4        MR. HUMBLE:  She's a very sweet girl who did that.

5        (General laughter.)

6        THE COURT:  All right.  Very well.  Thank you all.

7        MR. DONOVAN:  Thank you.

8        MR. HUMBLE:  Thank you.

9        (Hearing concluded at 2:06:46 p.m.)

10                       *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

27

C E R T I F I C A T E

        I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified December 30, 2019.

/s/John T. Schindhelm

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR
United States Official Reporter
517 E Wisconsin Ave., Rm 236,
Milwaukee, WI 53202
Website: WWW.JOHNSCHINDHELM.COM
